No. 48,420

STATE OF KANSAS, *Appellee,* v. DONALD W. GASSER, *Appellant.*

(574 P 2d 146)

Opinion filed November 5, 1977.

*Russell Shultz,* of Wichita, argued the cause, and *Willard L. Thompson, Jr.,* also of Wichita, was with him on the brief for the appellant.

*Stephen M. Joseph,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Stephen E. Robison,* assistant district attorney, were on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: This is a direct appeal from convictions of theft (K.S.A. 21-3701) and obstructing official duty (K.S.A. 21-3808).

Clyde Ralph, Joseph Teal, and defendant were arrested for stealing a truck containing quartered beef and attempting to sell the beef to undercover officers.

Defendant became acquainted with Clyde Ralph and Kent Green while all were guests of the state at the Kansas State Penitentiary as a result of previous crimes. After release in 1972, Green again ran afoul of the law and was arrested on state and federal charges in June, 1973. Hoping for leniency he became an operative for both state and federal authorities in early July, 1973. On July 18, 1973, Green reestablished contact with another Lansing alumnus, Quay Douglas Worth. (For a complete detail of that account, see *State v. Worth,* 217 Kan. 393, 537 P.2d 191, cert. denied 423 U.S. 1057, 46 L.Ed.2d 647, 96 S.Ct. 792.) The two of them went to the Seventh Step Foundation in Wichita on July 20, where they met Ralph, and Ralph consummated a firearm transaction with Worth. Green did not hear from Ralph again until the latter part of July when Ralph called him at his home in Burns, Kansas. At that time Ralph asked Green to stop and see him the next time he was in Wichita.

In the first part of August, Green went to Wichita to see Ralph at Worth's home. Over lunch the three discussed how they might make money by committing some burglaries and thefts. About August 20, Ralph, his wife and child, and defendant went to Burns to see Green. Green drove Ralph and defendant past banks in Burns, Florence and Cedarvale. Ralph told Green that since defendant worked at a packing plant they could steal a truckload of meat. Green contacted Carl Arbogast of the K.B.I. and told him what had transpired. The next day Ralph returned to Burns to inspect the inside of the bank.

On August 22, Ralph telephoned Green and told him the bank at Burns was going to be hit that night. Green called the K.B.I. and surveillance was set up. That evening Ralph, his wife, Worth, a man named Perez, and defendant went to Burns. Ralph unloaded burglary tools and took them into Green's house. Ralph and Perez left to reconnoiter the bank. They apparently spotted the surveillance and canceled their plan, returning to Wichita. The men feared they would be spotted if they carried the tools back to the car, so they left them with Green. The next day Ralph called Green and asked him to bring the tools to Wichita.

On August 26, Green took the tools to Wichita. While there

Ralph again stated that they could get some processed meat if Green could find a buyer for it. Ralph said the meat was cut, frozen and packaged in ten-pound boxes. He told Green he could get a 40,000-pound load and would sell it for $20,000. Green again contacted Arbogast and Arbogast called then Attorney General Vern Miller, who obtained the "buy money." On August 27, Green told Ralph he had found a buyer.

The next day arrangements were made to complete the transaction. Vern Miller selected a roadside park in Schulte, Kansas, as the place to meet. When Green called Ralph to tell him the deal was on, Ralph told him the meat would not be cut and packaged, but instead would be swinging and uncut at $16,000 a truckload. Ralph also told Green he wanted to meet the buyer and verify he had the money.

It was decided that Michael Gammage of the Alcohol, Tobacco and Firearms Bureau of the United States Treasury Department would pose as the buyer. Green and Gammage, with money in hand, drove to Ralph's home. Vern Miller was hiding in the trunk of the car. Upon their arrival Ralph emerged from his house, got into the car with them, and counted the money while Green drove around the block. Ralph was satisfied that arrangements were satisfactory and told them final details would be worked out later that evening. At about 6:00 p.m. Green called Ralph and told him to meet them at the roadside park in Schulte at 10:00 p.m. Attorney General Miller had the roadside park surrounded with officers.

At approximately 10:00 p.m., Green, Arbogast and Gammage arrived at the park with Miller in the trunk of the car. Three-quarters of an hour later a semi-tractor and refrigerated trailer drove past the park followed by a car similar to one in which Ralph said he would be riding. The driver sounded the car horn twice as he drove by. A few minutes later the car returned, drove into the park, faced the direction the truck had gone and blinked its lights twice. The truck soon pulled into the park and stopped near the car.

Agent Gammage walked to the rear of the trailer, opened the doors, shined a light inside and observed a large quantity of swinging uncut beef. Ralph stated he could only get half a load and the price would be $8,000. Gammage walked toward the front of the truck where he was met by defendant, who asked if

everything was all right. Gammage replied, "Yes," and the two returned to the rear of the truck. Defendant closed the trailer doors and wiped the handles for fingerprints. Gammage and defendant then walked to the car where Ralph was sitting. Gammage indicated he was satisfied and ready to pay. Ralph told him to pay defendant. Defendant and Gammage walked to Green's car to get the envelope containing $8,000 from Arbogast, who was standing beside the car. Defendant took the envelope and said he did not need to count the money. As he turned to leave, Gammage took defendant by the elbow and said, "Don't do anything silly, you are under arrest." As defendant turned and ran Arbogast yelled, "Police officers, you are under arrest." Defendant continued to run and the car containing Ralph and Teal sped away.

Upon a prearranged signal, Vern Miller leaped from the trunk of the car and sprinted after the fleeing defendant. Gunfire erupted and defendant was felled by buckshot from a shotgun fired by an officer hiding in the underbrush. Miller then apprehended defendant.

Defendant admitted participation in the theft, but contended he was entrapped by Green's actions. He admitted going to Burns to burglarize the bank but said he changed his mind when he saw other people around the bank. He alleged it was Green who concocted the scheme of stealing the meat because he had a buyer for it, and that Green first came to him and his friends with the idea. The only reason he went along with the plan was because he would receive a large sum of money.

As to the charge of obstructing official duty, defendant testified he ran from Gammage because he did not know Gammage was a police officer, but instead thought he was being "ripped off." Obviously, the jury chose not to believe defendant's version of the facts.

Defendant argues the facts of the case constitute entrapment as a matter of law. This contention has no merit. Where evidence is offered to support the defense of entrapment, a question of fact is raised whether the intent to engage in the offense originated in the mind of the defendant or was instigated by officers or agents of the state. (*State v. Amodei,* 222 Kan. 140, 563 P.2d 440; *State v. Carter,* 214 Kan. 533, 521 P.2d 294; *State v. Bagemehl,* 213 Kan. 210, 515 P.2d 1104; *State v. Reichenberger,* 209 Kan. 210, 495 P.2d 919.) It is a rare occasion when entrapment is established as

a matter of law. (*State v. Bagemehl,* supra at 213; *State v. Reichenberger,* supra at 218.)

The defense of entrapment is set forth in K.S.A. 21-3210 and its common law roots were traced in *State v. Reichenberger,* supra. As counsel for the state so adeptly points out, our entrapment law requires a two-pronged analysis of any case wherein entrapment is asserted. The jury must determine whether the defendant was induced or solicited by law enforcement officials for the purpose of obtaining evidence to prosecute that person, and, if so, whether (*a*) the police merely afforded a criminal predisposed to commit a crime the opportunity or facility for committing the crime, or (*b*) the crime was the type likely to occur or recur in the course of the defendant's business and the police did not induce or lead the defendant to believe the conduct was lawful.

A jury is required to look at the conduct of both the law enforcement officials and the defendant in each case where entrapment is asserted, unless there is absolutely no evidence to show the defendant was predisposed to commit the crime or was engaged in a business where the crime repeatedly and continuously occurred. (*State v. Bagemehl,* supra at 213.)

Defendant urges this court to abandon this so-called "subjective" or "origin of intent" test for the "objective" test adopted in several jurisdictions. The test used in Kansas is one used by the majority of jurisdictions and the "objective" test is the minority rule.

Under the "objective" test of entrapment the jury is forbidden to examine the criminal intent or conduct of the defendant asserting the entrapment defense, but is required to focus its inquiry solely on the acts of the law enforcement officials who participated with defendant in his criminal enterprise. (*McKay v. State,* 489 P.2d 145 [Alaska 1971]; *Grossman v. State,* 457 P.2d 226 [Alaska 1969]; *State v. Mullen,* 216 N.W.2d 375 [Iowa 1974]; *People v. Asher,* 67 Mich. App. 174, 240 N.W.2d 749 [1976]; *Commonwealth v. Jones,* 242 Pa. Super. Ct. 303, 363 A.2d 1281 [1976].) The "objective" test is described in *Grossman v. State,* supra at 229:

"    .   .   .   [E]ntrapment occurs when a public law enforcement official,    .   .   .   in order to obtain evidence of the commission of an offense, induces another person to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who is ready and willing, to commit such an offense.    .   .   ."

The inquiry in this test is not whether the defendant was entrapped by the public official's conduct, but whether an average man would have been induced to commit the offense. We cannot accept this as the proper standard of inquiry.

Entrapment is a defense used to negate a defendant's criminal intent to commit the crime for which he is charged by showing that the real criminal intent was conceived by law enforcement officials. (*State v. Jordan,* 220 Kan. 110, 551 P.2d 773; *State v. Hamrick,* 206 Kan. 543, 479 P.2d 854.) To disprove entrapment the state must show the intent and state of mind of the defendant on trial, not the state of mind of a mythical average man. In order to do this, it is proper to show the defendant was predisposed to commit the crime before the state approached him. The state may introduce evidence of prior convictions, criminal activities or previous suspicious conduct to disprove entrapment. (*State v. Amodei,* supra at 147; *State v. Reichenberger,* supra at 218.)

This does not mean, however, that the state is given a wholesale license to introduce a defendant's criminal past once he argues he was entrapped. Entrapment raises the issue of a defendant's predisposition to commit the crime for which he is charged. Evidence of other criminal enterprise must be related or substantially similar to the present charge to be admissible. (K.S.A. 60-445; *State v. Amodei,* supra at 147; *State v. Faulkner,* 220 Kan. 153, 551 P.2d 1247.) In the instant case evidence that defendant and his accomplices were planning to commit burglaries and thefts and had prepared to break into a bank was relevant in determining defendant's predisposition to commit the theft of the truck and its cargo.

Our reading of K.S.A. 21-3210 requires an inquiry into not only the actions of law enforcement officials but the criminal intent and predisposition of the defendant as well. Under the facts of this case the trial court was correct in letting the jury decide the issue of entrapment and the instructions given the jury on that issue were a correct reflection of our law.

Defendant's next alleged error relates to Instruction No. 18. This instruction cautioned the jury to consider only the evidence which had been presented in this case and not to concern itself or speculate as to evidence it felt might have been presented. The instruction further advised that a juror is not compelled to adhere to a point of view once arrived at if he is convinced after

consultation with his fellow jurors that his previous opinion concerning law or facts was erroneous. Defendant does not support his argument with any authorities.

Since no objection was given to the instruction at trial, the instruction must be clearly erroneous to warrant reversal. (K.S.A. 22-3414 [3].) It is not. See, *State v. Guffey*, 205 Kan. 9, 468 P.2d 254, wherein a similar instruction was approved. (See also, *State v. Owens & Carlisle*, 210 Kan. 628, 504 P.2d 249; *State v. Clouse*, 113 Kan. 388, 214 Pac. 103.)

Finally, defendant argues his conviction for obstructing official duty (K.S.A. 21-3808) cannot stand. This is premised on two arguments.

First, defendant argues Gammage was not in the process of discharging his official duties when he arrested defendant; thus, the statute does not protect him. According to defendant, Gammage must have been attempting to arrest defendant for violation of a federal law before he would be protected by K.S.A. 21-3808, and Gammage had no official duty since the arrest was for a state offense. We do not consider this argument persuasive. Whether Gammage had any official duties that evening as an agent of the Alcohol, Tobacco and Firearms Bureau of the Treasury Department is immaterial, since he was in fact assisting state agents in the performance of their official duties. The fact he posed as the buyer on behalf of the state and was there for that purpose negates the argument that he was there only as a federal officer or on a frolic of his own. Thus, breaking away and running from Agent Gammage was conduct unlawful under K.S.A. 21-3808. (See, *United States v. Chunn*, 347 F.2d 717 [4th Cir. 1965]; *State v. Merrifield*, 180 Kan. 267, 303 P.2d 155.)

Defendant also argues the conviction is void because Gammage was not sufficiently identified as a police officer. While K.S.A. 21-3808 does not require an officer be properly identified, it does require a defendant have reasonable knowledge that the person he opposes is a law enforcement official. The word "knowingly" in the statute requires this proof. (*State v. Bradley*, 215 Kan. 642, 527 P.2d 988.) The state must present evidence defendant knew Gammage was a police officer and the state's evidence shows that Arbogast shouted, "Police officers, you are under arrest." This statement was sufficient to present the charge to the jury. (*State v. Bradley*, supra; *Owens v. United States*, 201 F.2d 749 [4th Cir.

1953].) The conflict in evidence was properly resolved by the jury.

We find no error and the judgment of the trial court is affirmed.