IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,110

STATE OF KANSAS,
*Appellee*,

v.

BRIAN A. MURRIN,
*Appellant*.


SYLLABUS BY THE COURT

1.

A voluntary intoxication defense is available under K.S.A. 2018 Supp. 21-5205(b) "when a particular intent or other state of mind is a necessary element to constitute a particular crime," that is, when a defining mental state is a stand-alone element separate and distinct from the actus reus of the crime.


2.

Voluntary intoxication is an available defense to criminal trespass under K.S.A. 2018 Supp. 21-5808(a)(1)(A). The statute prescribes a stand-alone particular intent or other state of mind as a necessary element: The accused must know he or she "is not authorized or privileged to" enter or remain.


3.

Voluntary intoxication is not an available defense to interference with law enforcement under the language of K.S.A. 2018 Supp. 21-5904(a)(3) alone. The "knowingly" requirement in the statute defining interference with law enforcement simply modifies the actus reus. The statute prescribes no stand-alone particular intent or other state of mind as a necessary element. However, when the trial judge in this case

1

relied upon case precedent to add a stand-alone particular intent or other state of mind as a necessary element to prove the crime, then a voluntary intoxication instruction also should have been given.

4.

The two instruction errors identified in this case do not qualify as clearly erroneous; thus defendant's convictions must be affirmed.

Review of the judgment of the Court of Appeals in an unpublished opinion filed December 2, 2016. Appeal from Clay District Court; JOHN F. BOSCH, judge. Opinion filed March 8, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Richard E. James*, county attorney, argued the cause, and *Derek Schmidt,* attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Brian A. Murrin challenges a Court of Appeals panel's conclusion that a Clay County district court judge did not err by failing to instruct on voluntary intoxication in determining his guilt on charges of criminal trespass and interference with law enforcement. We agree with Murrin that the facts of this case made the voluntary intoxication instruction appropriate, but Murrin cannot establish that the failure to give the instruction was clearly erroneous and thus reversible. For the reasons outlined below, we affirm the Court of Appeals decision affirming Murrin's convictions.

2

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of August 18, 2014, Murrin and his wife, Alea, got into an argument. Murrin was drunk and "hollering things." At some point, Alea told Murrin that she had had "enough." Alea would testify at trial that Murrin left and came back "really drunk." Again, Murrin was "hollering things," which scared the couple's children. Alea believed that her daughter might have called the police to the apartment.

Officer Scott Galindo of the Clay Center Police Department responded to a 911 hang up at the Murrin's apartment complex. Galindo spoke with Alea and agreed to take her and the children to Grace True's house. True was Alea's mother-in-law. Galindo and another officer transported the family to True's. As Galindo was leaving, True told him that her son would come looking for Alea.

Later in the evening, Galindo was called to True's house for an "unwanted subject." Galindo arrived to find Murrin in the front yard, yelling at his wife and mother, trying to persuade Alea to come home. Galindo would testify at trial that Murrin appeared to have been drinking.

True told Galindo that she did not want Murrin on the property that night. Galindo relayed the request to Murrin and told Murrin that he would have to go home. Galindo warned Murrin that if he came back to True's house he would be arrested for criminal trespass. Murrin eventually walked away from True's house and toward his apartment complex.

After Murrin left, Galindo parked his car down the street from True's house and waited to see if Murrin would return. After 10 or 15 minutes, Murrin did. He went to True's front porch and began knocking on the door. Galindo approached the porch and

3

announced "'police, stop,'" at which point Murrin ran to the end of the porch, jumped over the railing, landed on his feet, and ran away.

Galindo returned to his patrol car and called dispatch before he began looking for Murrin. He eventually found him walking down another street. Galindo again announced, "police, stop," and this time Murrin stopped. Murrin told Galindo that he was not doing anything wrong. Galindo told Murrin that he had personally seen him on True's property and that he was under arrest for criminal trespass. When Galindo took physical control of Murrin, Murrin tried to break free, but Galindo was able to "keep him under control."

As part of a search of Murrin's person incident to his arrest, Galindo found marijuana and drug paraphernalia.

The State charged Murrin with felony possession of marijuana, misdemeanor possession of drug paraphernalia, criminal trespass, and interference with law enforcement.

At trial, True testified that on the night of Murrin's arrest, she could smell alcohol on his breath and that he was "acting like he was heavily intoxicated." True saw Murrin stumble a couple of times, but he did not fall. She also testified that her son had a history of alcohol problems and would often black out and not remember anything that had happened while he was drinking.

Galindo testified that when he initially responded to True's home, Murrin was in the front yard, yelling at Alea and True. He described Murrin as angry and belligerent and said he appeared to have been drinking. According to Galindo, after he told Murrin to leave, Murrin was able to "walk backwards" before walking away; he "wasn't staggering or tripping or stumbling."

4

Galindo also testified about Murrin's efforts to break free from him. Galindo testified, "First, I got the handcuffs on. As soon as I put the handcuffs on behind his back, he started leaning forward and tried pulling away from me and swinging his arms back and forth."

Clay County Sheriff's Deputy Ken Hughes also was present for the arrest and gave his account of it at trial. According to Hughes, Galindo held Murrin against the rear quarter panel of the patrol car. "Murrin tried to turn to face Officer Galindo and Officer Galindo put his hip [into him] and pushed him up against the car." Galindo then moved Murrin around to the trunk of the car. During cross-examination, Hughes attempted to clarify:

> "I wouldn't necessarily say it was [a] fight, but Officer Galindo had him against the car, like I said, and he was—his belt buckle would have been against the car, so his back is to Officer Galindo, and Officer Galindo had one arm holding him and the other arm was patting down, I do believe it was his right leg, because Galindo's back was to me, and I saw Murrin try to spin and Galindo had to put his hip into him to push him back up against the car."

After the State concluded its case-in-chief, Murrin called Alea as a witness. Alea recalled Murrin "was really inebriated, he was really drunk, he was hollering things. It scared my children." When Murrin would get that drunk, she said, "it's just best for me and the children not to be around it." Alea also claimed that the marijuana and drug paraphernalia were hers. She did not know why Murrin would have picked the items up and taken them from their apartment.

Murrin also testified in his own defense. Alea had told him that "she's done," when she first left. Murrin explained that the "bottle" is his typical recourse if Alea does

5

something like that. Murrin went to a friend's house. While there, he and his friend smoked marijuana, and Murrin "ended up taking more pain killers than [he] should have, mixing it with alcohol." Murrin believed that he and his friend had "consumed over a 30 pack [of beer] and half a gallon of whiskey."

Murrin's recollection of the rest of the night's events was hazy and incomplete. He recalled being at his mother's house and hearing someone yell, "'hey.'" Murrin ran, believing it was someone looking to fight him. The only other thing Murrin remembered from his encounter with Galindo was being put in the police car and asking why he was being arrested.

At the conclusion of evidence, the district judge and counsel discussed the jury instructions.

Murrin requested a voluntary intoxication instruction for the two drug-related charges. The State opposed the instruction, arguing that it was not factually appropriate. According to the State, because Murrin could remember some things, he was not intoxicated enough at the time of the crimes to warrant giving the jury the voluntary intoxication instruction.

Viewing the evidence in the light most favorable to Murrin, the district judge concluded the instruction was factually appropriate on the two drug-related charges and gave the instruction.

Murrin did not seek to extend the coverage of the voluntary intoxication instruction to the criminal trespass and interference with law enforcement charges.

6

The voluntary intoxication instruction ultimately read:

"The defendant raises voluntary intoxication as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant.

. . . .

"Voluntary intoxication may be a defense to the charge of possession of marijuana when such intoxication impaired the defendant's mental faculties to the extent that he was incapable of forming the necessary intent to exercise control over the substance, with knowledge of the nature of the substance.

"Voluntary intoxication may be a defense to the charge of possession of drug paraphernalia when such intoxication impaired the defendant's mental faculties to the extent that he was incapable of forming the necessary intent to use the drug paraphernalia."

The order of the instructions gave the jury the elements necessary to find Murrin guilty of the drug-related crimes first, followed by the voluntary intoxication instruction, and which was followed in turn by the elements instructions for criminal trespass and interference with law enforcement. These instructions read:

"**Instruction No. 11**

"The defendant is charged with criminal trespass. He pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant entered 1203 6th Street, Clay Center, Kansas.

7

"2. The defendant knew he was not authorized or privileged to do so.

"3. The defendant was told not to enter the property by the owner or other authorized person.

"4. The act occurred on or about the 18th day of August, 2014, in Clay County, Kansas.

"**Instruction No. 12**

"The defendant is charged with interference with law enforcement by obstructing official duty. He pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. Officer Scott Galindo was discharging an official duty, namely making an arrest.

"2. The defendant knowingly obstructed Officer Galindo in discharging his official duty.

"3. The act of the defendant substantially hindered or increased the burden of the officer in performance of the officer's official duty.

"4. At the time the defendant knew or should have known that Officer Galindo was a law enforcement officer.

"5. This act occurred on or about the 18th day of August, 2014, in Clay County, Kansas."

In addition, Murrin's jury was told that a verdict of guilt would require the State to prove that "the defendant committed the crimes intentionally. A defendant acts

8

intentionally when it is the defendant's desire or conscious objective to cause the result complained about by the State."

The jury found Murrin guilty on all four charges.

Murrin appealed three issues to the Court of Appeals: (1) whether the district judge should have instructed the jury on voluntary intoxication as a defense to both criminal trespass and interference with law enforcement; (2) whether a unanimity instruction was required for the interference with law enforcement charge; and (3) whether there was sufficient evidence to support the convictions for interference with law enforcement, possession of marijuana, and possession of drug paraphernalia. See *State v. Murrin*, No. 115,110, 2016 WL 7032086, at *1 (Kan. App. 2016) (unpublished opinion).

To determine whether the voluntary intoxication instruction should have been extended to the non-drug-related charges, the panel concluded that the "legally appropriate inquiry will turn on whether the crimes of criminal trespass and interference with law enforcement are general or specific intent offenses" because "[v]oluntary intoxication is only a defense to specific intent crime." 2016 WL 7032086, at *3 (citing *State v. Schreiner*, 46 Kan. App. 2d 778, 792, 264 P.3d 1033 [2011]).

With that as its analytical framework, the panel turned to the statutory definitions of each crime and noted that both demanded a culpable mental state of "knows" or "knowingly." See K.S.A. 2018 Supp. 21-5808(a)(1)(A) (criminal trespass requires person "knows such person is not authorized" to enter property); K.S.A. 2018 Supp. 21-5904(a)(3) (interference with law enforcement requires "knowingly obstructing, resisting or opposing" any person authorized by law to serve process in discharge of official duty). Under the culpable mental state statute, any crime requiring a "knowing" mental state qualifies as a general intent crime. See K.S.A. 2018 Supp. 21-5202(i). Thus, in the panel's

9

view, both criminal trespass and interference with law enforcement were general intent crimes, and a voluntary intoxication instruction was not legally appropriate. *Murrin*, 2016 WL 7032086, at *3.

Murrin petitioned for review on all of the issues presented before the panel. This court granted review only on the issue of whether a voluntary intoxication instruction should have been given for the criminal trespass and interference with law enforcement charges.

## DISCUSSION

This court follows a four-step progression when reviewing challenges to jury instructions:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." [Citation omitted.]

> """Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. [Citation omitted.] And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. [Citations omitted.]"

10

"'We examine "jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury." [Citation omitted.]' *Hilt*, 299 Kan. at 184-85." *State v. Mattox*, 305 Kan. 1015, 1020, 390 P.3d 514 (2017).

The parties agree, and the record reflects, that Murrin did not request a voluntary intoxication instruction for either the criminal trespass charge or the interference with law enforcement charge. Thus the clearly erroneous standard of K.S.A. 2018 Supp. 22-3414(3) governs whether any error found is reversible.

When the clearly erroneous standard applies, a reviewing court first determines whether there was any error at all by employing an unlimited review of the entire record. If the missing instruction was legally and factually appropriate, the failure to give it was error, and the court goes on to assess whether it is firmly "''convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal."'" *State v. McClelland*, 301 Kan. 815, 828, 347 P.3d 211 (2015) (quoting *State v. Cruz,* 297 Kan. 1048, 1066-67, 307 P.3d 199 [2013]).

The crux of the issue before us is whether a voluntary intoxication instruction would have been legally appropriate for the criminal trespass and interference with law enforcement charges. "To be legally appropriate, 'an instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm.'" *State v. McDaniel*, 306 Kan. 595, 615, 395 P.3d 429 (2017) (quoting *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 [2012]).

The extent to which voluntary intoxication is a defense in Kansas is governed by K.S.A. 2018 Supp. 21-5205(b), previously codified at K.S.A. 21-3208(2).

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

In his brief, Murrin argues that both criminal trespass and interference with law enforcement require a "particular state of mind," making a voluntary intoxication instruction legally appropriate for each.

The version of the criminal trespass statute under which Murrin was charged provides, in relevant part.

"Criminal trespass is entering or remaining upon . . . any . . . [l]and . . . by a person who *knows* such person is not authorized or privileged to do so, and . . . [s]uch person enters or remains therein in defiance of an order not to enter or to leave . . . personally communicated to such person by the owner thereof or other authorized person." (Emphasis added.) K.S.A. 2018 Supp. 21-5808(a)(1)(A).

And the applicable version of the statute defining the crime of interference with law enforcement states:

"Interference with law enforcement is . . . *knowingly* obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty." (Emphasis added.) K.S.A. 2018 Supp. 21-5904(a)(3).

The other statute Murrin relies upon to urge us to reach a conclusion favorable to him is the culpable mental state statute. That statute, which was adopted during a 2011 criminal code recodification, establishes a general rule that "a culpable mental state is an

12

essential element of every crime" and may be established by proof that the accused's conduct was committed "'intentionally,' 'knowingly' or 'recklessly.'" K.S.A. 2018 Supp. 21-5202(a). Murrin looks to the "knows" and "knowingly" language in the criminal trespass and interference with law enforcement statutes and characterizes it as creating a requirement for a "particular state of mind" that can be negated by voluntary intoxication under K.S.A. 2018 Supp. 21-5202(b).

Murrin acknowledges that his interpretation departs from earlier cases interpreting the language now in K.S.A. 2018 Supp. 21-5205(b). This court has long read that language to allow a voluntary intoxication defense to specific intent crimes while prohibiting it for general intent crimes. See *State v. Kershaw*, 302 Kan. 772, 777-78, 359 P.3d 52 (2015) ("although 'voluntary intoxication is not a defense to general intent crimes, such a defense may be used to negate the intent element of a specific intent crime'"); see also *State v. Sterling*, 235 Kan. 526, 528-29, 680 P.2d 301 (1984) (history of rule, discussing *State v. Wells*, 54 Kan. 161, 37 P. 1005 [1894]; *State v. Rumble*, 81 Kan. 16, 105 P. 1 [1909]). In his petition for review, Murrin argues that our caselaw has ignored the plain "other state of mind" language in the voluntary intoxication statute. That state of mind is distinct from "particular intent," which he equates with the concept of "specific intent" focused on by earlier cases.

The State counters with a slippery slope argument: if Murrin's interpretation is adopted, "then the voluntary intoxication instruction would be available for any crime except for strict liability offenses" because K.S.A. 2018 Supp. 21-5202 states "that a culpable mental state is an *essential* element in every crime." (Emphasis added.)

At least a part of the current confusion over the intersection of these statutes and the availability of a voluntary intoxication defense can be traced to evolution in the meaning of "intent" within criminal law. "Intent has traditionally been defined to include

13

knowledge, and thus it is usually said that one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts." 1 LaFave, Substantive Criminal Law § 5.2 (3d ed. 2018).

But under a more contemporary view, "intent"—or as it is sometimes termed, "purpose"—and "knowledge" are treated separately.

> "[A]s to the results of one's conduct, the [Model Penal] Code provides that one acts 'purposely' when 'it is his conscious object . . . to cause such a result,' while one acts 'knowingly' if 'he is aware that it is practically certain that his conduct will cause such a result.' . . . One is said to act 'purposely' as to the nature of his conduct if 'it is his conscious object to engage in conduct of that nature,' and to act 'knowingly' as to the nature of his conduct if 'he is aware that his conduct is of that nature.' As to the attendant circumstances, one acts 'purposely' when 'he is aware of the existence of such circumstances or he believes or hopes that they exist,' while one acts 'knowingly' when 'he is aware . . . that such circumstances exist.'" LaFave, § 5.2(b).

The modern distinction between intent and knowledge is embodied in the culpable mental states statute's definitions of "intentionally" and "knowingly" and mirrors the language of the Model Penal Code discussed above. See K.S.A. 2018 Supp. 21-5202(h) (person acts "intentionally," "with intent" with respect to nature of conduct or to result of conduct when it is "person's conscious objective or desire to engage in the conduct or cause the result"); K.S.A. 2018 Supp. 21-5202(i) (person acts "knowingly," "with knowledge" with respect to nature of conduct or circumstances surrounding conduct when "person is aware of the nature of such person's conduct or that the circumstances exist," with respect to result of conduct when person aware that "person's conduct is reasonably certain to cause the result").

14

In contrast, the historical development of voluntary intoxication as a defense in Kansas has embodied traditional notions and uses of intent that included "knowledge" within that term. See, e.g., *State v. Mountjoy*, 257 Kan. 163, 170, 891 P.2d 376 (1995) ("As used in the [pre-recodification] criminal code, the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.'"). Traditionally, "[t]he distinction between a general intent crime and a crime of specific intent is whether, in addition to the intent required by K.S.A. 21-3201, the statute defining the crime charged identifies or requires a further particular intent which must accompany the prohibited acts." *State v. Mitchell*, 262 Kan. 434, 442, 939 P.2d 879 (1997) (quoting *State v. Sterling,* 235 Kan. 526, Syl. ¶ 1, 680 P.2d 301 [1984]); see also K.S.A. 21-3201(a) (criminal intent essential element of every crime, may be established by proof accused's conduct intentional, reckless). If a crime did not require a specific intent, the crime required "only that the underlying act be intentional rather than accidental." *Gross v. State*, 24 Kan. App. 2d 806, 953 P.2d 689 (1998). "Simply stated, criminal intent is the intent to do what the law prohibits. If proof of criminal intent is required, it is not necessary for the State to prove that the accused intended the precise harm or the result that occurred." *Mountjoy*, 257 Kan. at 170.

The 2011 recodification did more than modify the meaning of "intent" in Kansas criminal law. Its addition of the culpable mental states statute provided guidance for classifying crimes as general or specific intent crimes. See K.S.A. 2018 Supp. 21-5202(h) ("All crimes defined in this code in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are specific intent crimes."); K.S.A. 2018 Supp. 21-5202(i) ("All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes."). In addition to crimes with an "intentional" culpable mental state, a statute may "provide that any other culpability requirement is a specific intent." K.S.A. 2018 Supp. 21-5202(h).

15

The crime of aggravated battery illustrates both the shift in the meaning of "intentionally" and the change in what it means to be a general intent crime. See *State v. Hobbs*, 301 Kan. 203, 340 P.3d 1179 (2015).

The predecessor to today's aggravated battery statute was adopted in 1969 and defined the crime as "'the unlawful touching or application of force to the person of another with *intent to injure* that person or another and which . . . [i]nflicts great bodily harm.'" (Emphasis added.) 301 Kan. at 207 (quoting K.S.A. 21-3414 [Weeks]). Under that version of the statute, this court treated aggravated battery as a specific intent crime. See 301 Kan. at 207.

In 1993, the statute was amended to define aggravated battery as "'[i]ntentionally causing great bodily harm to another person.'" 301 Kan. at 208 (quoting K.S.A. 1993 Supp. 21-3414). After the amendment, the Court of Appeals consistently treated aggravated battery as a general intent crime that "'simply requires proof that the defendant *intentionally* caused physical contact with another person.'" 301 Kan. at 208-09. It was enough if the intentional conduct—that is, the actus reus—incidentally caused the required great bodily harm.

In *Hobbs* we addressed whether the 2011 recodification changed whether proof that a defendant intentionally caused contact with another person could supply a sufficient basis for aggravated battery. During the recodification process, the Legislature amended the aggravated battery statute to define the crime as "'knowingly [rather than intentionally] causing great bodily harm to another person.'" 301 Kan. at 209 (quoting K.S.A. 2011 Supp. 21-5413[b]).

After reviewing the history of the aggravated battery definition in conjunction with the newly enacted culpable mental states statute, we concluded that the Legislature

16

did "not intend for 'general intent' to necessarily mean what it once did." 301 Kan. at 211. Although aggravated battery still could qualify as a general intent crime, it no longer would be sufficient for the State to prove merely that the accused intentionally caused contact with another. Following the dictates of K.S.A. 2018 Supp. 21-5202(i) for determining when a person acts "knowingly" with respect to his or her conduct, the person must have been "aware that his or her conduct was reasonably certain to cause the result." 301 Kan. at 211. We cautioned, however, that this "does not mean that the accused must have foreseen the specific harm that resulted." 301 Kan. at 211. It would be sufficient if "he or she acted while knowing that any great bodily harm or disfigurement of the victim was reasonably certain to result from the action." 301 Kan. at 211.

With all of the foregoing in mind, we are able to read the culpable mental states statute in conjunction with the voluntary intoxication statute and effect the purposes of both.

The voluntary intoxication defense continues to apply "when a particular intent or other state of mind is a necessary element to constitute a particular crime." K.S.A. 2018 Supp. 21-5205(b). We do not read the isolated phrase "particular intent" to be equivalent to "specific intent," as Murrin suggests. Rather, the entire clause as a whole communicates the traditional proposition that a "specific intent" is a stand-alone mental requirement separate from the actus reus of the crime. See LaFave §5.2 (e) ("most common usage of 'specific intent' is to designate a special mental element which is required above and beyond any mental state required with respect to the actus reus of the crime"). The key language in the statute is not "particular intent or other state of mind"; rather, it is the language that makes it a "necessary element to constitute a particular crime." This language establishes that voluntary intoxication is an available defense when a defining mental state is a stand-alone element separate and distinct from the actus reus of the crime. Compare K.S.A. 2018 Supp. 21-5807(a)(1) (burglary is entering or

17

remaining within a dwelling "with intent to commit a felony") with K.S.A. 2018 Supp. 21-5812(1) (arson is "[k]nowingly" "damaging any building or property" "by means of fire or explosive").

This is the flip side of the distinction that the Court of Appeals made after the aggravated battery statute was amended in 1993 so that it no longer required an "intent to injure" and only required that the accused "'[i]ntentionally caus[e] great bodily harm to another person.'" 301 Kan. at 208. Although the amended statute continued to use intent-based language, the Legislature had eliminated the stand-alone mental requirement of an "intent to injure." This changed the crime from a specific intent crime to a general intent crime.

We do not see our interpretation as at odds with the Legislature's declaration in K.S.A. 2018 Supp. 21-5202(a) that "a culpable mental state is an essential element of every crime." The fact that a "culpable mental state" is an "essential element" of "every" crime does not foreclose the possibility that some crimes also require a "particular intent or other state of mind [as] a necessary element."

Turning to the crimes at issue in this case, criminal trespass requires "entering or remaining upon . . . any . . . [l]and . . . by a person who knows such person is not authorized or privileged to do so . . . ." K.S.A. 2018 Supp. 21-5808(a)(1)(A). The actus reus of the crime is "entering or remaining." The statute does not explicitly prescribe a mental state necessary to that actus reus. But it does prescribe a stand-alone particular intent or other state of mind as a necessary element:  The accused must know he or she "is not authorized or privileged to" enter or remain. This is a classic specific intent crime because it requires a mental state separate and apart from whatever mental state is required for the actus reus. The Legislature's use of "knows" differs from its use of "knowingly" as a marker of a general intent. Cf. K.S.A. 2018 Supp. 21-5812 (arson,

18

"[k]nowingly, by means of fire or explosive damaging any building or property"); K.S.A. 2018 Supp. 21-5414(a)(2) ("Domestic battery is . . . knowingly causing physical contact with a person . . . ."). A voluntary intoxication instruction would have been legally appropriate for Murrin's criminal trespass charge.

In contrast, the "knowingly" requirement in the statute defining interference with law enforcement simply modifies the actus reus. The statute prescribes no stand-alone "particular intent or other state of mind" as a "necessary element." See K.S.A. 2018 Supp. 21-5904(a)(3) ("[i]nterference with law enforcement is . . . knowingly obstructing, resisting or opposing any person authorized by law . . ."). Based on the statute alone, a voluntary intoxication instruction would not have been legally appropriate.

There is, however, a further complication.

In this case, the instruction the district judge used for this charge was consistent with earlier caselaw in that it also required the jury to find that Murrin "knew or should have known that Officer Galindo was a law enforcement officer."

The portion of the instruction given in this case that corresponded to this judicial enhancement of the statutory elements of interference with law enforcement arguably set up an additional stand-alone mental state as a necessary element to convict Murrin. And, under the rule outlined above with respect to criminal trespass, this means interference with law enforcement would qualify as a specific intent crime for which voluntary intoxication would be available as a defense. This knowledge requirement appears to have been grafted on to the statutory crime by our court prior to the recodification of the criminal code and has continued to be articulated as a part of the recodified crime despite the absence of statutory language to support it. See *State v. Brown*, 305 Kan. 674, 689-92, 387 P.3d 835 (2017) (discussing what constitutes obstruction of official duty, stating

19

offense's elements include "[3] 'defendant knew or should have known the person he opposed was a law enforcement officer'"); see also *State v. Gasser*, 234 Kan. 24, 30, 574 P.2d 146 (1977) (stating interference with law enforcement requires "defendant have reasonable knowledge that the person he opposes is a law enforcement official"; "word 'knowingly' in the statute requires this proof"; relying on *State v. Bradley*, 215 Kan. 642, Syl. ¶¶ 1-2, 527 P.2d 988 [1974], involving aggravated assault of "uniformed or properly identified law enforcement officer[s]"). Even if we would question the propriety of the judicial enhancement today, as this case was instructed on the interference charge, it was error for the judge not to instruct on voluntary intoxication as a potential defense.

Having established error with respect to both crimes, we now turn to reversibility. As noted above, because Murrin did not preserve this issue below, he must establish clear error. To do so, he must convince us that "'the jury would have reached a different verdict had the instruction error not occurred.'" *McClelland*, 301 Kan. at 828. On the record before us, he cannot clear that high bar.

The jury was instructed on voluntary intoxication on the drug charges and did not accept the theory in that context. There was no evidence that Murrin's level of intoxication was any greater at the time the marijuana and paraphernalia were possessed than at the time he stood on the porch of his mother's home or at the time he attempted to break away from the arresting officer. Although Murrin was clearly intoxicated, there is no indication that the jury would have believed that he was so intoxicated that he did not know that he was not supposed to be on the property or that Galindo was a law enforcement officer, if, indeed, proof of the latter should even be required. His attempt to flee indicated otherwise, as did his physical agility in that flight.

The error by the district judge in failing to give a voluntary intoxication instruction does not rise to clear error, and thus Murrin's convictions must stand.

20

CONCLUSION

We affirm the Court of Appeals decision affirming the judgment of the district court.