IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,366

STATE OF KANSAS,
*Appellee*,

v.

THAD CHRISTOPHER GREEN,
*Appellant*.

SYLLABUS BY THE COURT

1.

An instruction on voluntary intoxication is unnecessary when there is no evidence to support impairment of the defendant that would make it impossible to form the necessary criminal intent.

2.

An instruction on a lesser included offense of voluntary manslaughter is unnecessary when the defense relies on a theory of sudden quarrel or heat of passion, and no evidence supports that theory.

3.

A district judge's refusal to instruct on voluntary intoxication and a lesser included offense of voluntary manslaughter when there is no evidence to support either instruction is a decision of law, not fact-finding involving weighing of evidence or evaluation of witness credibility. It does not violate a criminal defendant's constitutional right to jury trial.

1

4.

The rule of *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), does not apply in noncapital criminal cases. If it did, it would give no relief to a defendant whose jury was not faced with an all-or-nothing choice between conviction and acquittal.

5.

Even if it is error to admit a videotape of a criminal defendant's interview by law enforcement that is not redacted to remove the interviewers' critical comments on the defendant's credibility, the substance of the issue is unpreserved for appellate review in this case.

6.

A cautionary instruction on informant testimony is not necessary when the informants were not acting as agents of the State when they obtained the incriminating information and their testimony was corroborated by other testimony and evidence.

7.

The cumulative error doctrine does not apply when no errors or only one error is identified by an appellate court.

Appeal from Montgomery District Court; F. WILLIAM CULLINS, judge. Opinion filed August 21, 2020. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Jodi Litfin*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is defendant Thad Christopher Green's direct appeal of his convictions arising out of the death of Cameron Wawrzynaik. Wawrzynaik was the boyfriend of the defendant's ex-wife.

A jury convicted the defendant of first-degree premeditated murder, aggravated burglary, and arson. He raises seven issues in this appeal: (1) The jury should have been instructed on the defense of voluntary intoxication; (2) the jury should have been instructed on voluntary manslaughter as a lesser included offense of first-degree premeditated murder; (3) the district court judge's failure to instruct on voluntary intoxication and voluntary manslaughter deprived him of his constitutional right to a jury trial, because the judge made factual determinations that should have been made by the jury; (4) the failure to instruct on voluntary manslaughter pushed the jury to convict him of first-degree premeditated murder even if jurors had a reasonable doubt about whether the State had proved its case; (5) the district judge erred in admitting a videotaped interrogation of the defendant into evidence because law enforcement agents repeatedly challenged his honesty and truthfulness during that interrogation; (6) the district judge erred in refusing to give a cautionary instruction about testimony from jailhouse informants upon whom the State's case relied; and (7) cumulative error requires reversal of the defendant's convictions and a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of December 23, 2015, Mary Lou Vannoster, who lived in rural Montgomery County, Kansas, near Jefferson, looked out her living room window

3

and saw her "whole yard was lit up." She ran outside, saw that the house next door was on fire, and ran back inside to call 911.

Montgomery County dispatch sent firefighters and law enforcement, including Detective Matthew Hastings of the Montgomery County Sheriff's Office, to the scene of the fire. When Hastings arrived, the entire house was in flames and had "lost a lot of its height and its shape." An outbuilding north of the house and a pickup in the driveway also were on fire.

After speaking with Vannoster, Hastings found out that Wawrzynaik had been renting the burning house from another neighbor's son. Hastings tried to contact Wawrzynaik by phone but did not get a response.

Eventually Ron Cunningham, Wawrzynaik's stepfather, pulled up in a pickup. Cunningham believed Wawrzynaik was inside the burning house because Wawrzynaik's pickup was in the driveway.

As this situation evolved just north of the Kansas-Oklahoma border, Martha Donelson Green and Fred Green were at home near Burbank, Oklahoma, south of the border. About 12:15 a.m., Martha heard Fred answer a phone call.

Martha could hear "screaming and yelling" coming from the person who had called. She could not hear much of what was being said—"just a really serious situation was going on." She could hear Fred responding to the caller "really calm." The only word from the caller that Martha could make out—a word she "heard real clear"—was "blood." She believed Fred was talking to one of his sons—the defendant or his brother, Dustin. After the call was over, Fred "started crying." According to Martha, "[H]e was yelling, 'I

4

lost my son. I lost my son.'" Martha "thought that whatever happened on the phone . . . was, you know, life or death," but Fred would not tell her what had happened.

Martha was caring for her grandbaby that night and needed help dealing with both Fred and the baby; so she sent a text message to her daughter, Tasha Fox. Tasha and her husband, Brad, shared an address but not a residence with Martha and Fred. The Foxes came over, and Tasha took the baby upstairs, where she called 911.

Sheriff's Deputy Mike Stasyszen from Osage County, Oklahoma, was dispatched to Fred and Martha's house. When he got there, Fred did not want to talk to him and told him to go away. Eventually Martha let him into the house. Stasyszen would later testify that "[Fred] was very frantic inside the house. He was running around picking up stuff, throwing it down. He—like he was looking for something. He just kept saying, 'I've got to go. I've got to go.'"

Fred eventually calmed down: "His face was still red. He still wasn't, like, real coherent. He really wasn't his self, and he was trying to calm down. He wanted law enforcement to leave." Martha told him, "Well, we've got to figure out what's going on, Fred," but "he just wouldn't talk about it."

Fred left the house, and Martha asked the sheriff's deputies who remained if they had heard about any wrecks or about the defendant or his brother "getting into trouble." Martha would later testify: "[T]hen I told them about [the defendant] and [Ramanda Green] having the divorce case and that Cameron [Wawrzynaik] was in Kansas. And I said, 'You need to call Kansas and find out if something's happened up there.'" Martha was worried that the defendant had hurt Wawrzynaik. Stasyszen would later testify that Fred had told [Martha], "My son just killed somebody," and then became irate and, according to her, "went crazy."

5

Stasyszen called dispatch to let them know Fred had left his home. The dispatcher was Lacy Ferguson, who happened to be Ramanda's sister-in-law. Ferguson told Stasyszen that the defendant was separated from Ramanda. She also told him that the defendant was mad at Ramanda and her current boyfriend because Ramanda would not take the defendant back. Stasyszen asked Ferguson if she knew where the boyfriend lived; she told him that the boyfriend lived near Independence, Kansas. Stasyszen then asked Ferguson to contact Montgomery County to do a welfare check on the boyfriend.

Ferguson asked her husband, John, who was on duty as an Osage County deputy, to contact Ramanda to make sure she was okay. Ramanda was fine, but she had not been able to get in touch Wawrzynaik. When Montgomery County was contacted, the Oklahoma authorities learned that there was a fire at Wawrzynaik's house in Kansas.

Hastings would later testify about receiving a call from Osage County dispatch. The dispatcher told him she might have information about the fire and "officers in her county had been dispatched to the residence of a Fred Green [on a] report that he was mentally distraught. She said that there was a belief that his son may have killed his ex-wife's boyfriend."

When Hastings learned this information, he believed that Wawrzynaik had been in the burning house and that it could be the scene of a homicide. Because of this and the nature of the fire, Montgomery County contacted the state Fire Marshal to assist.

While Hastings waited for the state authorities to arrive at the scene of the fire, one of the firefighters informed him that human remains had been found in the house. Their location was consistent with the reported location of Wawrzynaik's bedroom. Although

6

the defendant immediately became a suspect, he was not located by law enforcement until about noon on December 23.

Earlier that day, KBI Special Agent Jeremy Newman followed up on a "ping" of the cell phone number believed to be the defendant's. The ping, conducted from Independence, Kansas, showed that the phone was near Burbank, and Newman and another KBI agent drove to Pawhuska, Oklahoma, where the defendant and Ramanda Green each lived.

When Newman arrived in Pawhuska—about 70 minutes' drive from Independence—he sought another ping of Green's cell phone; it again showed that the phone was located near Burbank.

Also early that morning, KBI agent David Falletti interviewed Brayden Green and Donna Barnes at the Osage County Sheriff's Office. Brayden is the defendant's son from a relationship before his marriage to Ramanda. Barnes is Brayden's mother. Brayden told Falletti that his father had awakened him about 1 a.m. and told him he "did something bad." His father was upset and starting to cry. Brayden would later testify that his aunt, Kimberly Cass, came to the defendant's house later and took him to his uncle's house to stay the rest of the night.

When the defendant later showed up at Cass' home, Cass contacted law enforcement, and they arrested him. One of the arresting officers would later testify that he heard him "make a comment about he didn't even own a gun. 'How could—could I have killed him if I didn't own gun[?]'"

7

Newman and Falletti interviewed the defendant after the arrest. The agents first gathered general personal information, including that the defendant had left the Army on the previous June 2.

After the defendant's Miranda rights were read, the agents questioned him about his relationship with Ramanda. When asked about divorce, the defendant said, "Oh, man. This is bad. I'm going to start out with the beginning for you, okay."

The defendant told the agents that he and Ramanda were living in Washington state before his deployment but decided she would move back to Oklahoma with the kids while he was gone. A few days before Green left the country, Ramanda flew to Washington so he could see her one more time. During that trip, he said, he caught Ramanda having sex with another man. Despite this indiscretion, he said, the couple "decided, you know, we were going to just enjoy the time that we have. It was a mistake that was made I—you know, I always forgive her, I love her."

When the defendant completed his deployment, Ramanda again flew to Washington to see him. He said: "[Y]ou know, and I could tell something was different about her. Man knows when his woman's been tampered with. And . . . I don't give a shit, you know, I'm glad to be here with her." Again, Ramanda returned to Oklahoma while the defendant finished his service time. Then, although Ramanda told him to stay in Washington, he returned to Oklahoma.

Green continued:

"Anyway I get home and she doesn't want to be around me or nothing. So I was kind of like, you know: Mandy, I want to be with you, you know. And she said: All right, well, we'll work on you and me. And we did, we was—you know, she acted like it

8

anyway. And went over to the house when I had the kids with me. And it was a Father's Day weekend and I went over to the house and I sat down on the porch—she wouldn't let me stay there, I had to live at my mom's just a couple blocks down the road[].

"I sat on the porch, and the kids, they ran in the house. I had my cigarette, and I was just sitting there. She comes to the door and she shut the door behind her. Not all the way, just about that far open. And she, she said:  You can't be here. And I was like:  What are you talking about? I already knew about Cameron, okay, I did. She told me."

The defendant believed that Ramanda "was wanting to separate from me but I was wanting to kind of work on it. She told me she wanted to work on it too but in the meantime I—when we was working on it she also let me know that she was seeing Cameron." The defendant said he thought:  "Well, hell, I got to pick up my game, you know." He also claimed that he could accept that she was seeing someone else, "because, hell, I did deploy, I left her."

The defendant then described events from Father's Day weekend.

"Kids run in, she comes to the house—or the door. She kind of closed it behind her. She said:  You can't be here. And I thought:  Why? She said:  I got company. And I was like: You got—you got Cameron here? She said:  Yes. I said:  Well, I want to meet him. She said:  No. I said:  Mandy, I want to meet the man who's fucking my wife, at least give me that."

The defendant said he pushed past Ramanda and opened the door with his foot. By that point, he "was pretty heated" and Wawrzynaik

"raised his hand to hit me and I told him, I said: [']You hit me and you'll see what happens.['] Well, he put his arm down. Mandy came in between us and—Mandy came in between us, this guy took off running. Running. Well, if you're running I'm going to

9

chase you, you know. He's tagging my wife. At the time I was still in love with her deeply, you know. And so I chased [him.]"

The defendant said Wawrzynaik ran across the street to Ramanda's father's home. The two men scuffled, and Wawrzynaik grabbed the defendant by his shirt. Eventually Ramanda's father was able to break them up. The defendant got into his Jeep with his children and drove away. He told the agents that a sheriff's deputy stopped him "about a mile down the road" and told him he "was breaking and entering, [committing] assault and battery in the presence of a minor." He claimed that he spent three days in jail as a result of the incident before charges were dismissed.

The defendant then insisted he had "moved on" from his relationship with Ramanda and was "doing fine." He said he had girlfriends, although he "never stabilize[d] with one person. I call them chew toys, you know, because ain't nobody going to mean anything to me anymore."

The defendant next talked about his divorce from Ramanda, which had been finalized a few weeks earlier. He said he "pretty much won. Nobody won, it's a lose-lose situation. But [he] felt like . . . for a father to get joint custody, [he was] doing pretty good."

The night the divorce was finalized, the defendant was supposed to have time with his children. Ramanda brought them to his house, and he claimed that she told him she had to "get rid of Cameron." He "figured [she] would," stating "I mean hell, you had to choose him—What[,] you going to choose him over the kids? And man, that bitch." He said Ramanda then told him again that she wanted to work on her relationship with him. Although he said he was initially skeptical, she hugged him and he thought, "Oh, my God all right, cool we can do this."

10

The defendant then continued his story:

"She spent a week and a half with me. We—she'd stay with me for several days and then I'd go spend the night with her. You know, about a week and a half went by and on Friday she came to my work and she said: Thad, I don't want to do this no more. I want him. And I thought: Oh, my God, make your damn mind up you're playing with people, you know. And that's pretty much the end of it, you know. She—she left to be with him and she contacts me all the time and we talk and . . . I'm not one to give up. I don't want to give up.

. . . .

"There's nothing wrong with that, that's just the way I was taught, you know. And—but it's more than just me and her riding on this, it's those three kids and they want to see us together so bad. So I thought I'd fight for them and I kept—every time me and Mandy would talk about me and her. I'd say: Hey, you know, remember this in the past and what we used to do when we was little and things like that. Well, you know we need to work on you—we need to put the family back together.

"I wasn't buying it about anything. And she would always get kind of upset and it would get me upset too, but finally I was just kind of like: I'm done. I mean I'm done. So I don't know."

One of the interviewing KBI agents asked the defendant when he had seen Ramanda last. He said she had sent him a text message the afternoon of the day before, asking whether he had heard from his divorce attorney. He was not going to talk about that with her because "at that time, you know, she was doing her thing[;] I was doing mine." But, as the conversation continued, he brought up "me and her kind of doing something again" and they "made a decision that he was going to come over and . . . going to hang[ out] with her and maybe stay the night, you know. No sex, nothing like

11

that, it's just—I just . . . wanted to visit with her and everything. I even took her a present."

Although Ramanda told him she would call him back, he never heard from her. He called her about 8 p.m., and she said she was in the middle of putting the children to bed and said she would call or text him "in a little bit." When he did not hear from her, he texted and she did not reply. He assumed she must have fallen asleep, but he wanted to take her present to her. And he "was so excited about going and being with her, you know, and I love her." He went to her house and knocked, but she did not come to the door. He left the present and a note at Ramanda's door. The present, a knife, was wrapped in $1 bills.

The defendant said he went home and began drinking and fell asleep while watching a movie. When he woke up, he "was wanting to go hunting." He was trying to prepare but "was still pretty fucked up." Later, when the defendant took his rifle and went hunting, he said, he passed out and woke again about 11 a.m. When he realized his phone had been off, he turned it on

> "and hell, all hell broke loose. People were texting me or—texting me and asking me where I was. And I—and so I was like:  I'm going to call Mom, you know. I called my mom and she—she enlightened me on some stuff and I was like:  Holy dog shit."

According to the defendant, his mother told him to come to town right away and go to the Sheriff's Department. He said that she told him Wawrzynaik had been shot and killed and that law enforcement believed he was responsible. The defendant drove to town, went to a friend's house and then to his sister's, where he was arrested.

The agents asked the defendant whether he or his mother had been getting any information from Facebook or other social media. He said he did not use Facebook very much but, while he was driving to town, a "friend of mine called and she's like:  Thad, [Ramanda] is posting shit on Facebook saying that you killed Cameron." When asked why someone would say he had something to do with Wawrzynaik's death, the defendant replied:  "Well, I'm her ex, I mean it's reasonable. I can see that, you know."

When one of the agents asked the defendant if he had been in Kansas within the last couple of days, he said it was possible, because he "hit[s] a lot of back roads." The next question was whether he had ever been to Wawrzynaik's house. He said that he had been there during the divorce proceedings to investigate whether Ramanda was living there with the children.

The defendant denied any involvement in the killing. When asked again why people would say he might have been involved, he replied:

> "Because at one time I—I hated him for what he'd done. He knew I was in the Army. He knew I was serving the country that he walks on . . . . He was with the woman I love, I love her. I mean I do. And he was around the kids.

> "So yeah, I had some anger for him because he knew I was in the Military. He knew she was married to me and I was coming home. He knew I wasn't going to be happy, no man would be happy. But I backed off, you know. At first I was very pissed. That day I went through the door, that was my house. So yeah, I was pissed off. Yeah, there was hate there at one time. But hell, . . . I've got girlfriends that look way better than her now."

When the agents told the defendant that they knew he had talked to several people about 1 a.m., saying he done something wrong, he conceded that he had talked to

13

someone but claimed he was referring to committing suicide. One of the agents pointed out that he had not said he was *going to do* something but that he *had done* something. But the defendant continued to insist that he had not told anyone he had done anything; he talked to people only about wanting to kill himself.

The defendant admitted that he had spoken with his dad and did not have an explanation for why his dad would tell law enforcement he had been in Kansas and had had "something to do with Cameron's death." He denied being at Wawrzynaik's house that night or knowing what had happened there. When the agents pressed, the defendant said, "I drink so I get kind of depressed sometimes. Well, like, you know, she kind of basically stood me up so I went to drinking and hell."

When asked about the amount he had drunk, the defendant said he had drunk half a bottle of Triple Crown but did not "kill" the bottle; "[Y]ou know, I sip it with my soda."

The agents continued to confront the defendant about his father's and Brayden's statements that he told them he had done something bad, but the defendant continued to insist that he was talking only about wanting to kill himself.

One of the agents then asked the defendant why data from cell phone towers showed that he had been near Wawrzynaik's house. The defendant said, "Because I back road when I drink. I mean most people—lot of people do. I mean, hell, I get on the road and I just go." When reminded that he had said earlier in the interrogation that he passed out at home after drinking, the defendant said simply:  "I woke up."

The agents continued pressing the defendant, who continued resisting. Yet he eventually said, "I didn't go to Cameron's house but I was—I had been drinking and I went down some country roads and I ended up over there and . . . I just came home."

14

When the agents returned to the subject of cell phone records, the defendant admitted it would be "reasonable" for the records to show that he had been near the house because he "was up there around there so it's going to put me close." He admitted, "I was drinking, was going down the road, took a back road. I ended up—I did end up in Kansas. I was in the vicinity of the house and I turned around and came home." When asked how close he had come to Wawrzynaik's house, the defendant said, "I can see the railroad track and I knew to get the fuck out of there." At trial, a law enforcement officer would testify there were railroad tracks approximately 1,100 feet from Wawrzynaik's house.

The agents asked the defendant if he owned any firearms. He denied that he did, claiming Ramanda had made him pawn all of his guns. When asked why Brayden would say that he had a pistol, the defendant initially said that a friend had brought a gun to his house and possibly left it there for a time. In response to one of the agents pointing out that it was odd the defendant would mention on arrest that Wawrzynaik had been shot, because that had not yet been determined, the defendant claimed that his mother had told him Wawrzynaik had been shot.

The agents again asked the defendant to explain the statements his father and Brayden had made to law enforcement. The defendant said, "I was protecting Brayden for the worst when it comes to me because, you know, I was thinking about—I was going to shoot myself." One of the agents immediately asked, "With what?" The defendant responded: "My rifle—not my rifle but it's my hunting rifle. It's not really mine, it's Dad's, .45-70 lever-action."

When the defendant recounted purchasing alcohol, one of the KBI agents asked whether, when he was driving to Kansas, he was "to the point where you think you would have blown over the state legal limit?" The defendant responded: "Oh, yeah, yeah."

15

The defendant claimed he did not intend to confront Wawrzynaik when he drove to Kansas. He said, "I did not want to do that. I just—I don't really know what I was thinking at the time and I had a good idea where I was going but I was just kind of just letting—" The defendant attempted to clarify by saying that he meant only that he "knew the roads [he] was taking. . . . I mainly just wanted to go for a joy ride but it led me there so—somewhere around there and I—and I seen that railroad track and I think: Fuck that shit, and I left."

Throughout the remainder of the interview, as recorded on the videotape eventually shown to the jury at trial, the defendant maintained that he had nothing to do with Wawrzynaik's death.

The interview with the agents concluded when the defendant told the agents he wanted a lawyer's assistance, but the jury was not made aware of this request or its result.

The State charged Green with premeditated first-degree murder, arson, and aggravated burglary.

Before trial, the State filed a motion to admit evidence of other crimes or civil wrongs under K.S.A. 60-455. The State wanted the district judge to allow the jury to hear the defendant's statements about driving under the influence, asserting that the evidence would show the defendant was not intoxicated to the level that would prevent him from forming the necessary intent. The judge allowed the evidence, saying:

> "The Court would believe that it would go to his state of mind. He does talk about intoxication; that's going to come up. And if the Defendant makes a statement in there, which he does, that he wasn't too intoxicated to not remember or drive, that shows that he was in clear control of his faculties, so the Court's going to find that that is admissible.

16

"And the Court does not feel that any prejudice would result to the Defendant[,] would outweigh the need to admit it and explain to the fact that his intent—or that his state of mind was not to an extent that he was so intoxicated he couldn't understand what was occurring."

At trial, Ramanda was the State's first witness. She recounted the difficulties of her relationship with Green and admitted her infidelity in Washington right before the defendant was deployed. In her view, the marriage continued to deteriorate during the deployment, and she began dating Wawrzynaik. When Green came back, she sought a divorce.

Ramanda also described the Father's Day altercation. She was fearful about what the defendant would do when he got out of jail and obtained a protective order. She continued dating Wawrzynaik, and they moved in together in Kansas. She did not tell the defendant. When he found out, he said, "Not happening," and "I'll see you in court." The judge in the divorce case ordered her to bring the couple's children back to Oklahoma.

The divorce was granted the day before Thanksgiving, and Ramanda said she rejected the defendant's suggestion that evening to "forget it all" and get married again. Later that night, while the children were staying with the defendant, he sent a text to Ramanda: "'You're staying the night with him instead of me. I know you're going to have sex with him. You just told me that we could work on us. That ain't right. What am I supposed to think about that?'" He continued to send similar lovelorn texts: "I can't play your games anymore"; "I can't get your voice out of my head. You're driving me crazy. I'm always looking out for you. I told you I would always be there for you even when you don't want me"; and "Bite your lips. Your words are robbery. Do you grin inside 'cause you're killing me? All along we've talked of forever. I kind of think we won't get better."

17

Ramanda conceded that she made some effort to work on her relationship with the defendant after the divorce, including having sex with him, but insisted that she did not want to get back together. She said she was appeasing him and fearful for the children's safety in his custody.

Ramanda and Wawrzynaik split up temporarily during the weeks after the divorce, which she attributed to choosing her children over him after the judge in the divorce case entered an order preventing him from being around the children. When she began seeing Wawrzynaik again, she was concerned the defendant would find out: "I didn't know how he was going to react. I was scared."

In mid-December, Ramanda said, the defendant told her that he would kill Wawrzynaik. She testified that he "said it a lot": "[t]ext message, telephone, face to face. Any time he got angry, he said it." At one point, the defendant told her he would shoot Wawrzynaik. Specifically, on December 17, Ramanda received a text from the defendant that read: "You need to get off this shitty Cameron thing. It's getting old and starting to piss me off." When Ramanda responded, telling the defendant that the problem was not Wawrzynaik, the defendant responded, "'It's always about him. Yes, we are done. But me and him are not done. Almost every day I learn or acquire more and more info on him. He's a dead duck.'" Ramanda did not think the defendant would follow through on his threats, but, she said, Wawrzynaik "took it a little bit more serious."

Three days later, when Ramanda and the defendant texted about Christmas gifts for the children, the defendant asked about a photograph of Ramanda and Wawrzynaik together, which, apparently, he had seen on Facebook. Ramanda asked whether he was watching Wawrzynaik. He responded that he had other people to do that but that he was watching her.

18

According to Ramanda, the defendant again said "he was going to kill Cameron" in a phone conversation on December 22. He said that "he hated him because he tore his family apart." Despite this threat, Ramanda eventually consented to the defendant's request to come by that evening; still, she did not answer the door when she heard a knock. Via text, Wawrzynaik advised Ramanda to call the police. Instead, Ramanda called her father, who was the long-time chief of police in Barnsdall, Oklahoma, hoping he would be able to come over and tell the person on the porch to leave. As it turned out, the person at the door left without encouragement from anyone, and Ramanda continued to communicate with Wawrzynaik, speaking with him on the telephone until about 11 p.m.

Two hours later, Ramanda was alerted by her father that "something was going on," and she tried unsuccessfully to contact Wawrzynaik by phone. When her father reached her house, he found a letter and a gift on her front porch. The gift box was wrapped in one dollar bills. Based on what was written in the first couple of lines of the letter, the handwriting, and the use of "Mandy," Ramanda was able to identify the letter and gift as coming from the defendant.

Ramanda's father, John L. Ferguson, also testified at trial, describing the Father's Day incident and Ramanda's fear for Wawrzynaik's safety after the divorce. Ferguson had been on duty in Barnsdall on the night of December 22 when his daughter called him, and he could not come to her house in Pawhuska to assist her with the person knocking on her door. He advised her to call her brother or the local police. He confirmed Ramanda's version of what occurred when he called her later and came to her house to take her and the children to his home. Later that day, Ramanda and her family learned that Wawrzynaik had died.

19

Kevin Young, an Osage County Sheriff's deputy, also testified about a threat the defendant had made about Wawrzynaik. Young had interviewed the defendant after the Father's Day incident, when the defendant "was real agitated, animated, and upset, mad." Young said, "He told me he was going to go—that he wanted to kill Cameron because he was committing adultery with his wife." The only reason Wawrzynaik was still alive, according to the defendant, was that "he couldn't catch him."

The State also presented evidence from two witnesses who had known the defendant since school days. One, David Dove, testified that the defendant bought a gun from him in September or October 2015. The gun "was pink; about three to four inches; a six—six-shot revolver." The other, Amber Radford, testified that she had a Facebook conversation on November 25, 2015, with the defendant about a pink gun he had "just bought." He sent her a picture of it.

Martha also testified during the State's case, describing the late-night phone call to Fred, his extreme reactions to it, the arrival of the Foxes, and law enforcement's eventual response to the house she shared with Fred. Before Fred left the house, she took a loaded gun from him. She still did not know who had called Fred, but she understood him to be on the way to that person's house. She spent the rest of the night with the Foxes, contacting Cass to check on the defendant and Dustin. She eventually got word that Cass had found Dustin, who was fine, and was told that Cass had gone to the defendant's house and picked up Brayden. Cass told Martha that the defendant would not talk to her and Cass thought he was under the influence of something.

Martha also had seen the defendant with a pink pistol on her property on Thanksgiving.

20

Fred also testified and, on the prosecutor's urging, described the defendant's hurt over the divorce and Ramanda's relationship with Wawrzynaik. He admitted that both he and the defendant knew where Wawrzynaik lived; he had taken photos at Wawrzynaik's place during the pendency of the divorce, and the defendant had been with him when he did so.

According to Fred, the defendant called him just after midnight on December 23, and, "Well, he—he acted as though he was kind of—he was drunk. He acted suicidal, and he was going to hurt himself. And I thought maybe he might have—had already hurt himself." Fred admitted that he was very upset when he got off the phone, because "I couldn't help my son. He's drunk. I've never seen him drunk like this. He's never, ever been—I've never seen my son drink like this or act like this on alcohol." He said that his statement that he had lost his son meant that he thought the defendant was going to commit suicide and "as a father, I failed."

Fred denied knowing during the phone call where the defendant was or had been. He said he did not want the defendant to go deer hunting the next morning, as planned, but he did not want him driving drunk. Fred also denied that the defendant had mentioned Wawrzynaik or Ramanda during the call. He did recall the defendant mentioning something about blood, but he assumed that he was cutting himself.

Fred acknowledged that he did not want to talk with law enforcement that night. He said that when he left his house, he intended to go to Pawhuska and look for the defendant, "but then if there was something wrong, if he had something, I couldn't face it. And if he had done some—if he committed anything, suicide to himself, I can't—I can't be there. I can't. I didn't want to be there." As a result, Fred did not end up going to the defendant's house. Fred agreed with the prosecutor that he had "probably" tried to call the defendant at 12:52 a.m., 1:11 a.m., and 1:24 a.m. to find out where he was.

Fred said he received a text from the defendant at 2:13 a.m., at which point the defendant was at Fred's house and ready to go hunting. Fred was no longer worried because his son had driven there safely and seemed to be over his "suicidal thing." Fred told the defendant that law enforcement was at the house but figured they must have left by that point. Fred was home and in bed about 3 a.m., unconcerned about Martha because he thought she would have gone to the Foxes' house.

The State showed Fred a photograph of a pink revolver. He was initially reluctant to answer questions but eventually conceded that he had seen the defendant with a similar gun.

Cunningham, Wawrzynaik's stepfather, testified for the State that his stepson had been "afraid of what the ex-husband would do" after the divorce. He also described getting a call about the fire about 1:30 a.m. on December 23. When he arrived at the scene, the house was basically "gone." When he was told a body had been found, he "knew it was my son." After he went home to tell his wife what had happened, he returned to the scene to tell law enforcement about the "trouble between Cameron and the ex-husband."

The State also called Brayden to testify. He confirmed that his father had awakened him in the early hours of December 23, but he said he could not remember what happened, other than being picked up by his aunt and going to his Uncle Dustin's house. He also had seen his father with a pink revolver before that night and had not seen him with it since.

The defendant's sister, Cass, testified about a text exchange she had with the defendant on November 24 and 25—when the divorce had just become final. The

22

defendant told her to look up "'The Chick Lady .38.'" Cass could not remember if she actually looked it up, but her text message in response was: "That's nice and pink." She conceded that the "Chick Lady" was a gun. Green responded to Cass' text message: "Yea. It's very smooth with a laser pointer. I don't have one. Nope. Nope. Nope. Not me. Not at all."

Cass said she and the defendant had planned to go hunting on the morning of December 23, but she changed her mind because she had to work. Shortly after midnight that morning, she received a call from Martha, who wanted her to check on Dustin and the defendant. She checked on Dustin first and everything seemed fine with him. The two of them then went to check on the defendant but went to Kum & Go first. Cass said they were not in a big hurry, "[b]ecause Thad's a big boy. . . . He's a good kid." When the pair arrived at the defendant's house a little after 1 a.m., the defendant told them he was fine. Cass thought he "may have been drinking." She told him she needed to work rather than go hunting, and he said he still wanted to go. Because he was going to leave, she and Dustin took Brayden with them. Cass said she also was "ornery" as she left, putting the defendant's hunting gun behind a door. She claimed she did not want him to get a bigger deer than she had or would. She "wouldn't say [the defendant was] suicidal, but it would—anybody going through a divorce, you know—it's hard on a heart, yes."

The next morning, while Cass was at work, Brayden's mother, Barnes, came to tell her before noon that "the law was looking for Thad." Cass told Barnes that he was probably out hunting.

When the State called Barnes to testify, she confirmed the defendant's upset over his divorce and his possession of a pink gun. Barnes said she did not remember telling law enforcement, "I know he did something really bad," but she probably told Brayden that his dad was "in a lot of trouble."

23

Barnes, who was present when the defendant was arrested midday on December 23, did not remember hearing him say, "I don't own a gun. How could I shoot him if I don't own one[?]" as he was being arrested. Before that point, when she had spoken to the defendant by phone, she told him Wawrzynaik had been killed; she thought she "said . . . he was murdered and his house was burnt." She did not think that she had told the defendant that Wawrzynaik had been shot.

Anthony Celeste, a special agent for the state Fire Marshal, testified about his investigation of the cause of the fire at Wawrzynaik's house. Celeste concluded the cause was "incendiary," which meant "a person intentionally setting a fire where fire should not be." Based on the scene alone, he could not rule out either incendiary or accidental causes. His conclusion took into consideration that "[p]rimarily . . . we had a homicide right—prior to this fire and then statements that were reported to me made by Thad Green."

Erik Mitchell, a forensic pathologist, testified about the results of Wawrzynaik's autopsy. Wawrzynaik had been shot at least four times in the chest. In addition, Mitchell identified an injury to Wawrzynaik's head but could not determine its specific nature because of fire damage to the body. There was "heat-fixed blood" around some of the injuries, which was consistent with trauma rather than fire. This showed "that a lot of blood was released into the airway, and then there was fire." Wawrzynaik was "injured prior to the time of exposure to significant heat." Mitchell concluded that the manner of death was homicide:

> "The gunshots that involved the chest, untreated, would be expected to kill. The
> gunshot that goes through the left kidney, given time, would probably kill. The gunshot

24

that just goes through the chest wall, that is—might or might not. . . . The anatomic findings, pretty much define that the only reasonable explanation is that it is a homicide."

Lamar Shoemaker, another special agent with the state Fire Marshal, observed the autopsy and testified to establish the time when law enforcement first learned that Wawrzynaik had been shot. Mitchell informed Shoemaker of that fact 3:30 p.m. to 4:00 p.m. on December 23—after the time when the defendant was arrested.

The State also introduced evidence from multiple cell phone providers. Rhonda Woolman from the Mid-States Organized Crime Information Center analyzed the data and testified to the results. She concluded that a 7:02 p.m. call on December 22 from the defendant's phone was made through a cell tower just outside of Pawhuska; a 12:13 a.m. call on December 23 from his phone was made through a tower just outside of Coffeyville, Kansas; and a 12:40 p.m. call on December 23 from his phone was made through a tower just outside of Pawhuska.

Newman testified about his December 23 videotaped interview of Green, discussed above, as well as an interview of Fred about seven months after the murder. Fred told Newman that, when he was unable to find the defendant in Pawhuska on the night of the murder, he "stopped by the side of the road, had an emotional breakdown until he had received the text message from Thad, and then he returned back to his residence." Fred also said that Cass had placed the hunting rifle, which was his, outside of the defendant's house when she was there and that Fred had picked it up.

Christopher Williams, who was a detective with the Montgomery County Sheriff's Office at the time of Wawrzynaik's murder, testified about a January 2016 jailhouse call between the defendant and members of his family. While talking to Cass, the defendant said, "Leviticus 20:10," and then repeated it for her. Williams read Leviticus 20:10 for the

jury: "If a man commits adultery with another man's wife—with the wife of his neighbor—both adulterer and the adulteress are to be put to death."

Robert Martin, who was in jail in Montgomery County at the same time as the defendant, testified that he overheard the defendant "telling the story" of the murder of Wawrzynaik. The defendant was acting out his movements, "had his hand up in the shape of a gun and was moving like he was pulling the trigger." Martin said,

> "Before I knew it was Cam, he pretty much said that he, you know, he studied him. Knew that his Facebook—address that he had on Facebook was the wrong one.
>
> "He said that . . . he was feeling down, had been drinking, missing his kids, and drove from Osage to Cam's house, pulled up, looked in the window, seen Cam sleeping, went into the back door and stood over him with a .22 mag revolver and killed him, and that he lit the house on fire but did not use an accelerant. And he said he learned that in his military background.
>
> "He said the only mistake he made was the one phone call he made in between towers. He said he didn't destroy the gun but they wouldn't find it."

At the end of this recitation, according to Martin, the defendant mentioned "Cameron," at which point Martin asked, "'Cam[?]'" The defendant looked at Martin "real fast and—and he said, 'Only people that are close to him know him as Cam.'"

A cellmate of defendant's, Matthew Herndon, also testified about what the defendant had told him about Wawrzynaik's death:

> "That the night of him coming to Kansas—prior to him coming to Kansas that he'd gone to Ramanda's house to—to try to get in touch with her and knocked on the

26

door. She didn't answer, so he then came to Kansas to—with the intention to just spray-paint the house or something.

. . . .

"He said that after he got there—he'd showed up at the residence, he—he, like, approached the house and he looked in a window, and he noticed that Cameron was asleep in—in a bed in the house."

On seeing the sleeping Wawrzynaik, the defendant thought "this was his chance." Herndon said he understood the defendant to mean that he could pay Wawrzynaik back "for what he had done. You know, with getting with Ramanda."

According to the story Herndon described at trial, the defendant picked the lock to one of the doors to Wawrzynaik's house. "And he went in the house. Cameron was asleep in bed, and he told him to wake up. Screamed at him to wake up, and shot him three times. . . . Well, at the same time, he said he shot him three times, and then Cameron was startled from—and jumped up out of bed and—and stumbled on one side of the bed, and then he shot him two more times." The defendant had a "pink .38 revolver with a laser sight on it." He also had a knife with him.

After the second set of shots, while Wawrzynaik was on the floor, "[the defendant] took the knife he had and stabbed him in the base of his neck." The defendant told Herndon, "that the blood just exploded, kind of, you know, all over his hands and stuff. And that—then he had realized what you know, something bad had just happened." The defendant decided to burn the house down. "[H]e took a lighter and lit a pair of nylon shorts that Cameron was wearing on fire first and then different spots inside there—the house."

27

Herndon further testified that the defendant called his dad and "told him that he'd done something bad." According to Herndon, the defendant also described going into his own house and waking his son up and saying "a man's got to do what a man's got to do." The defendant then washed his clothes and "went somewhere on his father's property." Once there, the defendant said, someone "advised" him to return to his own house for his clothes. After retrieving them, he went back to his father's, cleaned up his Jeep, and dumped bleach on his clothes and hands. He also told Herndon that he met with someone and hid the gun on his father's property, under a downed fence near a pond.

After Herndon testified, Newman was recalled to testify that Herndon had told him the defendant described Wawrzynaik's house as sparsely furnished, something not previously known to law enforcement. Ramanda confirmed this fact to Newman.

Although Fred's property was searched, no gun was found. Through the testimony of Joseph Dye, the State admitted recordings of several jailhouse calls between Green and acquaintances and family. Of note, the defendant and Fred spoke in September 2016, shortly after Fred's property had been searched. Fred told the defendant that "company" had come the other day and that everything "went fine." Fred also said the company did not have a warrant, but, if they wanted to look, he would let them look. Later in the same conversation, the defendant asked Fred about the price of metal and said it might be a good time to melt metal down and sell it.

The State also played a recording of a conversation between the defendant and Barnes. The call apparently took place before the defendant's September 2016 conversation with Fred. In the call, Green implored Barnes to get in touch with his father and repeatedly told her to tell him to "melt it down."

After the State rested its case, the court held a jury instructions conference outside the presence of the jury. Defense counsel requested a cautionary instruction for informants testifying in exchange for benefits. The district judge denied the request, saying:

> "The Court would note that the first criteri[on] is if the informant's testimony is substantially uncorroborated. It would appear to the Court that Matt Herndon's testimony and Bobby Martin's testimony is substantially corroborated."

The judge also noted that at the time Martin and Herndon got at least their initial information from the defendant, they were not agents of the State.

Based on the evidence presented, defense counsel also asked for voluntary manslaughter and voluntary intoxication instructions. Counsel argued that, based on Herndon's testimony, "the plan or the information that he obtained was to simply go up and maybe spray-paint the property; however, because of the intoxication, drinking, the holidays, and the depression, . . . he just snapped."

Again, the district judge denied the requests, saying:

> "THE COURT: All right. I'll make this simple. The Court's going to deny anything below second-degree intentional. The Court does not believe heat of passion would apply. This was an ongoing issue that—the divorce between and the relationship between the victim, Ramanda Green, and Thad Green—this was an issue that had gone on for months, if not a year. It was clearly not done in the heat of passion. As the State would indicate, there is evidence that he wrote a note and that he had plans—and planned to go up to Kansas. So for those reasons, heat of passion would not apply.
>
> "As to the intoxication defense, there is evidence in the record as it would relate to intoxication, but there's no evidence as to what the Defendant's intox—state of mind

29

was at the time the incident occurred—or the act occurred, so the record is completely void of any evidence that would show that he was intoxicated at the moment that this happened.

"The Court listened to the Defendant's statement to—talk about how much alcohol he had been consuming. He made a lot of statements in there. He said he had just killed the alcohol—he didn't just kill the alcohol, he would sip on it. He said he drank his normal amount.

"The Defendant, in a statement to the KBI agent, says that he remembers it all. He denies blacking out. Says he was over the legal limit, but he was driving—not to an extent that he would be impaired because he didn't draw the attention of law enforcement.

"His son says that when he was woke up, his dad was drinking but he didn't seem intoxicated. His son Brayden testified that when he woke him up he seemed normal. And the Court would note in Brayden's taped statement that he did not mention his dad being intoxicated.

"His sister—the same thing. She mentioned that she saw alcoholic bottles; said that she smelled alcohol, but his sister never said that he was drunk.

"And then the Court would note for the record, the Defendant appeared to take steps to conceal his crime, which would show that he knew what he did was wrong."

Defense counsel pointed out evidence from Cass that the defendant was intoxicated and Fred's testimony that his son was "slurring his words, that he was drunk and suicidal," but the judge rejected its evidentiary value:  "[A]s to the last statements about his sister and his father, the Court has no idea when the Defendant consumed the alcohol; whether or not he consumed it before the crime occurred or after the crime occurred."

The jury deliberated after receiving final instructions and hearing closing arguments from counsel. It found the defendant guilty on all charges. The district judge

sentenced Green to a hard 50 for first-degree premeditated murder, 34 months for aggravated burglary, and 19 months for arson. The district judge ordered that all sentences run consecutive.

## DISCUSSION

*Refusal to Instruct on Voluntary Intoxication*

This court analyzes appellate challenges to jury instructions in four steps:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012).' [Citation omitted.]

> """"Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. [Citation omitted.] And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. [Citations omitted.]'

> """"We examine 'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citation omitted.]" *Hilt*, 299 Kan. 184-85.' *State v. Mattox*, 305 Kan. 1015, 1020, 390 P.3d 514 (2017)." *State v. Murrin*, 309 Kan. 385, 391-92, 435 P.3d 1126 (2019).

31

Because the defendant requested a voluntary intoxication instruction at trial, this issue is preserved for review. *State v. Perez-Medina*, 310 Kan. 525, 533-34, 448 P.3d 446 (2019).

"To be legally appropriate, 'an instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm.'" *Murrin*, 309 Kan. at 392.

The extent to which voluntary intoxication is a defense in Kansas is governed by K.S.A. 2018 Supp. 21-5205(b), which states:

> "An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

See also *State v. Dominguez*, 299 Kan. 567, 591-92, 328 P.3d 1094 (2014) (voluntary intoxication valid defense when crime requires specific intent). The crime of premeditated first-degree murder is a specific intent crime, and "voluntary intoxication may be used as a valid defense." 299 Kan. at 591-92. A voluntary intoxication instruction in this case would have been legally appropriate.

But this court has held that "simple consumption of drugs or alcohol is not enough to support" voluntary intoxication—"[p]roof of impairment is also necessary." *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017).

> "A defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a jury instruction. *State v. Hernandez*, 292 Kan. 598, 606-07, 257

32

P.3d 767 (2011) (defendant's ability to recall his or her actions demonstrates faculties intact)." *Davis*, 306 Kan. at 414-15.

See also *State v. Kidd*, 293 Kan. 591, 595-96, 265 P.3d 1165 (2011) (evidence defendant consumed alcohol from a bottle, made "crazy" statements, may have been "'buzzed'" insufficient to require voluntary intoxication instruction). Moreover, a reviewing court "'will not infer impairment based on evidence of consumption alone.'" *State v. Reed*, 302 Kan. 390, 400, 352 P.3d 1043 (2015) (quoting *Hernandez*, 292 Kan. at 607). A loss of memory or inability to remember events before or during the offense may establish the inability to form intent, as can evidence the defendant is "'so impaired that he or she has lost the ability to reason, to plan, to recall, or to exercise motor skills as a result of voluntary intoxication.'" *Reed*, 302 Kan. at 400 (quoting *State v. Betancourt*, 299 Kan. 131, 141-42, 422 P.3d 353 [2014]).

In his brief to this court, the defendant focuses on Fred's testimony that the defendant was drunk in the early morning of December 23 when he spoke to him by telephone, as well as similar testimony from Cass. As the district judge noted, to the extent that such evidence established consumption—or even impairment—it could not establish it for the time when the crime was committed. It was evidence only for the period *after* the crime.

The defendant also relies on his own statements to investigators that he had passed out at home on the night of December 22 and that he passed out the next morning while hunting. But these statements fail to support the necessary alcohol impairment for the same reason that the testimony from Fred and Cass do: They do not deal with the relevant time. Even if one credits the claim that the defendant passed out at home, as he explained to law enforcement, he "woke up" and started driving around before ultimately ending up near Wawrzynaik's house.

Moreover, the defendant's own statements established that he had not lost the ability to "exercise motor skills" at the time of the crime. See *Betancourt*, 299 Kan. at 142. He was able to drive, and he never claimed in his statements to law enforcement that he had blacked out or could not remember a portion of the night. He consistently denied going all the way up to Wawrzynaik's house, but ultimately there were no gaps in his narrative of what happened from the time he left home that night until the time he passed out while hunting—in other words, wherever the defendant was during that period, even he did not claim to be so impaired that he could not form the necessary criminal intent.

Finally, the defendant also points to the district judge's allowance of K.S.A. 60-455 evidence of his driving while under the influence of alcohol. As the State noted in making its pretrial request to admit the evidence, its purpose was to establish that, regardless of consumption evidence, the defendant was still able to drive and able to form criminal intent.

We reject the defendant's argument that the district judge erred by refusing to give a voluntary intoxication instruction. It was not factually appropriate because of a lack of evidence of impairment that would prevent the formation of the necessary criminal intent.

*Refusal to Instruct on Voluntary Manslaughter*

Our standard of review for this issue is the same as that governing the defendant's first appellate challenge. See *Murrin*, 309 Kan. at 391-92.

The defendant properly preserved this issue in the trial court by seeking the instruction. See *Perez-Medina*, 310 Kan. at 533-34.

This court has regularly acknowledged that lesser degrees of homicide qualify as lesser included crimes of first-degree premeditated murder. *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019).

> "An instruction on a lesser included crime is legally appropriate. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). And a lesser included crime includes a 'lesser degree of the same crime.' K.S.A. 2017 Supp. 21-5109(b)(1). This court has recognized five degrees of homicide. In descending magnitude, they are capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. *State v. Carter*, 305 Kan. 139, 161, 380 P.3d 189 (2016) (citing *State v. Cheever*, 295 Kan. 229, 258-59, 284 P.3d 1007 [2012]).' *Pulliam*, 308 Kan. at 1362." *James*, 309 Kan. at 1298.

Thus voluntary manslaughter would have been a legally appropriate instruction in this case.

The defendant argues that he was entitled to a voluntary manslaughter lesser included instruction because the jury could have found that he knowingly killed Wawrzynaik "upon a sudden quarrel or in the heat of passion" under K.S.A. 2018 Supp. 21-5404(a)(1). "Heat of passion" is defined as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *State v. Johnson*, 304 Kan. 924, 932, 376 P.3d 70 (2016).

The defendant relies on the testimony of one jailhouse informant who mentioned that the defendant's original intention in going to Wawrzynaik's house was to vandalize it with spray paint. He argues that the "jury could have concluded that once [the defendant] got there, 'because of the intoxication, drinking, the holidays, and the depression, that he just snapped.'" But no witness testified that the defendant "snapped" when he reached

Wawrzynaik's house. The "snapped" scenario was part of defense counsel's argument in support of the voluntary manslaughter instruction before the district court, but the judge correctly perceived that the great weight of the evidence introduced by the State painted an entirely different picture.

The accumulated evidence from the informants as well as numerous other witnesses was that the defendant had been thinking about killing Wawrzynaik for some time before the murder. Indeed, it is hard to imagine a more thorough or convincing case being made to support first-degree premeditated murder by a jilted spouse. This was not a case in which any reasonable juror could conclude that the defendant was motivated to kill Wawrzynaik because of a sudden quarrel or heat of passion. There is zero evidence that Wawrzynaik did anything as the defendant entered his house that could be characterized as provocation. The only evidence is that he was sleeping.

The district judge correctly denied the requested voluntary manslaughter instruction.

*Constitutional Right to Jury Trial*

The defendant also argues on appeal that the district judge's refusal to give his requested jury instructions violated his constitutional right to a jury trial. He does not specify whether he is relying on the United States Constitution or the Kansas Constitution; nor does he state precisely which aspect of a jury trial he was deprived of. It appears that he claims the district judge made legally impermissible *factual* determinations in refusing to give the voluntary intoxication and voluntary manslaughter instructions.

The defendant is correct to the extent that he argues, "Prosecutions for violations of state criminal statutes unquestionably implicate Section 5 [of the Kansas Constitution Bill of Rights]. A defendant is entitled to 'have the truth of [the] charge determined by an impartial jury.'" *State v. Love*, 305 Kan. 716, 736, 387 P.3d 820 (2017) (quoting *In re Rolfs*, 30 Kan. 758, 763, 1 P. 523 [1883]).

But, that being said, the determination of whether there is *any* evidence making a lesser included instruction or an instruction on an affirmative defense factually appropriate is a question of law. Neither the district judge who makes such a decision in the first instance nor any appellate judge or justice sitting in review of that decision engages in weighing evidence or determining witness credibility. The job is merely to detect the presence of any evidence to support the instruction sought; the jury takes it from there.

In this particular case, we have already agreed with the district judge on the nonexistence of evidence to make a voluntary intoxication or voluntary manslaughter instruction factually appropriate. This also settles what we perceive to be the constitutional question raised by the defendant under the banner of the right to jury trial. A criminal defendant has this right, and, as part of the exercise of it, must be able to present his or her theory of the case, supported by legally correct jury instructions. See *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003) (defendant entitled to present theory of defense; exclusion of evidence integral to theory violates defendant's fundamental right to fair trial). But, without evidence in support of them, neither the voluntary intoxication nor the voluntary manslaughter instructions would have been legally correct because they were factually inappropriate. See *Love*, 305 Kan. at 736.

*Constitutional Right to Due Process*

The defendant argues for extension of the rule in *Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), to support his challenge to his murder conviction on due process grounds. He argues that the district judge's refusal to instruct on voluntary manslaughter forced jurors who might have been reluctant to acquit him outright and release him to choose to convict him of a crime more serious than the one he committed.

We have seen this argument before in other cases. See, e.g., *State v. Love*, 305 Kan. 716, 729-30, 387 P.3d 820 (2017). And we have rejected the extension of the rule in *Beck*, a capital case, to noncapital cases. *Love*, 305 Kan. at 734 ("Unlike the statutory scheme in *Beck*, the Kansas lesser-included-offense statute does not create a 'capital specific artificial barrier to the provision of instructions on offenses that actually are lesser included offenses under state law.'"); see *State v. Becker*, 311 Kan. 176, 186-87, 459 P.3d 173 (2020); *State v. Timley*, 311 Kan. __, 2020 WL 4555417 (No. 120,414, filed August 7, 2020). The defendant nevertheless argues that this rejection erects an "artificial barrier" to instruction on a state law lesser included offense that *Beck* disapproved of.

We are not convinced by the defendant's argument. As the United States Supreme Court later explained its holding in *Beck,* its primary concern had been

> "that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. We explained:

'[O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty [in Alabama] may encourage it to acquit for an equally impermissible reason—that, whatever his crime, the defendant does not deserve death. . . . [T]hese two extraneous factors . . . introduce a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case.' [447 U.S.] at 642.

"We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented. See *id.,* at 629, 630, 632, 634, 637, 642-643, and n. 19, 100 S. Ct., at 2385, 2386, 2387, 2388, 2389-2390, 2392-2393, and n. 19. As we later explained in *Spaziano v. Florida,* 468 U.S. 447, 455, 104 S. Ct. 3154, 3159, 82 L.Ed.2d 340 (1984), '[t]he absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free. . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.' See also *Hopper v. Evans,* 456 U.S. 605, 609, 102 S. Ct. 2049, 2051-2052, 72 L. Ed. 2d 367 (1982). This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." *Schad v. Arizona*, 501 U.S. 624, 646-47, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991).

Until the United Supreme Court indicates otherwise, we are disinclined to extend the *Beck* rule to noncapital cases.

Furthermore, in this case, the defendant's appellate argument ignores that his jury was not faced with an all-or-nothing scenario on the first-degree premeditated murder charge. His jury was given an instruction on the lesser included offense of intentional second-degree murder. Had it been unconvinced by the mountain of premeditation evidence presented in the State's case detailed above, it could have convicted the

39

defendant of another homicide offense that falls between first-degree premeditated murder and voluntary manslaughter in gravity and possible punishment. We hold there was no error under either *Beck*'s letter or its spirit.

*Admission of Videotaped Statements in Law Enforcement Interview*

The defendant's next allegation of error in the district court has more substantive merit than those discussed above. He asserts for the first time on appeal that the videotape of his interview by KBI agents included the interviewers' impermissible negative comments on his credibility and should have been redacted before being shown to the jury at trial. He is correct on this point. See *State v. Elnicki*, 279 Kan. 47, Syl. ¶ 4, 105 P.3d 1222 (2005) (error for jury to be shown videotape in which law enforcement officer comments on defendant's credibility).

The problem for the defendant arises from the words "for the first time on appeal." The defense failed to object in the district court to the lack of redaction about which it now complains. This means the issue was not preserved, and we may refuse to address its merits on appeal under the contemporaneous objection rule codified in K.S.A. 60-404.

The defendant argues in his brief that we should apply an established exception to overlook the preservation problem. In his view, this issue raises only a question of law arising on proved or admitted facts and is finally determinative of the case, and consideration of it is necessary to serve the ends of justice or to prevent denial of fundamental rights. See *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005). He also argues that we should reach the substance on this issue because of judicial economy; in essence, dealing with the issue now will eliminate the need for the defendant's later filing of a K.S.A. 60-1507 motion to reverse his convictions based on defense trial counsel's constitutionally deficient performance.

40

We are not convinced by any of these arguments for an established exception or a judicial economy-based ruling. Even if we agree that the failure to redact the videotape to remove the interviewers' comments on credibility was error, that error would be far from finally dispositive of this case under the first preservation exception urged upon us by appellate defense counsel. It also would be harmless under our state statutory standard. See K.S.A. 2019 Supp. 60-261 ("court must disregard all errors and defects that do not affect any party's substantial rights").

Likewise, because of our view on the harmlessness of any error, the second preservation exception is inapplicable. The ends of justice and the defendant's fundamental rights are not endangered by error that could have made no difference in the outcome of his trial.

And, finally, because even ineffective representation by defense counsel cannot lead to reversal of the defendant's convictions without prejudice under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and innumerable Kansas decisions following it, see, e.g., *State v. Moyer*, 309 Kan. 268, 278-79, 434 P.3d 828 (2019), trial defense counsel's failure to object on this issue cannot support a later K.S.A. 60-1507 motion likely to take up much of any court's time.

One last point bears mention. This case truly is a poster child for the contemporaneous objection rule. The videotape of the defendant's statements to the KBI agents was already redacted to remove the defendant's invocation of his right to have counsel present with him and any material that came after it. That redaction was either agreed upon by the prosecution and defense, or it was ordered by the district judge. Either way, it prevented the necessity of raising that failure to redact as an issue on appeal. This is precisely the way that the contemporaneous objection rule is supposed to work. It is

41

designed to give parties incentive to raise legal issues in the district court so that the judge presiding over the case has an opportunity to hear from the parties, analyze the law, and prevent error from infecting the process. Here, our law that one witness is not permitted to comment on the credibility of another is far from new. See *State v. Akins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014) (determination of truthfulness of witness for jury); *State v. Drayton*, 285 Kan. 689, 700, 175 P.3d 861 (2008) (witness may not express opinion on credibility of another witness; determination of truthfulness of witness for jury); *State v. Plaskett*, 271 Kan. 995, 1008-09, 27 P.3d 890 (2001) (error to allow detective to express opinion on credibility of victim); *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986) (error to allow two expert witnesses to express views on reliability of statements by complaining witness). Our law that the prosecution cannot be allowed to achieve the equivalent by exposing a jury to law enforcement agents' negative comments about a defendant's credibility during a recorded interview also is not new. See *Elnicki*, 279 Kan. 47, Syl. ¶ 4. The record in this case makes us confident that the parties and the district judge in this case would have had no trouble preventing anyone from having to address this issue today if the contemporaneous objection rule had been observed. This confidence also makes us more likely to enforce the rule without exception.

*Refusal to Give Cautionary Instruction on Informant Testimony*

The standard of review on this issue is the same as that governing the first two issues discussed above.

This challenge was preserved by the defendant's counsel during the jury instructions conference at trial.

Defendant seeks shelter under our rule that "ordinarily it is error to refuse to give a cautionary instruction on the testimony of a paid informant or agent where such

testimony is substantially uncorroborated and is the main basis for defendant's conviction." *State v. Novotny*, 252 Kan. 753, 760, 851 P.2d 365 (1993). But this shelter is unavailable to him.

In *Novotny*, we held that failure to give such an instruction was not error or ground for reversal when it was not requested and informant testimony had been substantially corroborated. *Novotny*, 252 Kan. at 760.

In addition, in *State v. Lowe*, 276 Kan. 957, Syl. ¶ 5, 80 P.3d 1156 (2003), we held that a district judge is not obligated to "give a cautionary instruction on informant testimony absent evidence that a witness is acting as an agent for the State in procuring evidence." See also *State v. Ashley*, 306 Kan. 642, 648, 396 P.3d 92 (2017) (declining invitation to reconsider *Lowe*; informant cautionary instruction not required when "information was passed to the witness at a time when the witness was not serving as an agent of the State—that is to say, the witness had not been contacted by the State and was not intentionally given the role of investigator").

Here, neither jailhouse informant was acting as an agent for the State when he first received incriminating information from the defendant. In addition, the testimony of each informant was corroborated by multiple witnesses and other evidence presented by the State at trial. The district judge did not err in denying the cautionary instruction.

*Cumulative Error*

The defendant's last issue on appeal invokes the doctrine of cumulative error. Cumulative trial errors may require reversal if, under the totality of the circumstances, they substantially prejudiced the defendant and resulted in an unfair trial. But the doctrine is inapplicable if there is no error or only a single error. See *Love*, 305 Kan. at 737.

43

We have rejected each of the defendant's appellate challenges, although we saw merit in one whose substance we did not reach because of lack of preservation and the inapplicability of any exception to the contemporaneous objection rule. Under these circumstances, the cumulative error doctrine cannot help the defendant.

CONCLUSION

We have thoroughly reviewed the record on appeal and examined each of defendant Thad Christopher Green's issues on appeal. No error requires reversal. The judgment of the district court is affirmed.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

* * *

ROSEN, J., concurring:  I agree with the majority's conclusions in this case and nearly all of its analysis. I write separately only to make my position clear on issues dealing with affirmative defense instructions.

The majority has concluded there was no evidence indicating Green was impaired at the time of the crime and, consequently, a voluntary intoxication instruction was not factually appropriate. I agree with this. However, I part with the majority's discussion on this issue to the extent it implies that the presence of *any* evidence tending to support the

---

[1]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 118,366 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

44

defendant's affirmative defense theory will justify an instruction on that defense—no matter how slight the evidence or how improbable the theory. The affirmative defense statute directs trial judges to instruct on such defenses only when "competent evidence," or "that which could allow a *rational* fact finder to *reasonably conclude* that the defense applies" is present. (Emphases added.) K.S.A. 2019 Supp. 21-5108(c). As I explained in *State v. Haygood*, 308 Kan. 1387, 1410, 430 P.3d 11 (2018) (Rosen, J., concurring), the language in this statute requires that the court act as a gatekeeper when offering instructions by "mak[ing] some assessment of the strength of the evidence on which" an affirmative defense assertion stands. While I agree there was no evidence of impairment here, I disagree with any portion of the majority decision holding that the presence of any evidence, however slight, mandates the district court to instruct and skip this test.

STEGALL, J., joins the foregoing concurring opinion.