IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,726

STATE OF KANSAS,
*Appellee,*

v.

KEESHAUN W. MILO,
*Appellant.*

SYLLABUS BY THE COURT

1.

Felony murder imposes strict liability for homicides caused by the attempt to commit, commission of, or flight from an inherently dangerous felony. Thus, self-defense is never a defense to felony murder. A self-defense instruction may only be given in felony-murder cases to the extent it may negate an element of the underlying inherently dangerous felony.

2.

Self-defense is a legal justification for the use of force in defense of oneself or another. Given this, a self-defense instruction is not legally appropriate when the defendant is charged with a crime which does not include an element that can be legally justified by the use of force in defense of oneself or another. There is no self-defense justification for the sale of cocaine or marijuana.

3.

A defendant may not assert self-defense if the defendant is already attempting to commit, committing, or escaping from the commission of a forcible felony.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed May 20, 2022. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, was on the briefs for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

STEGALL, J.: Keeshaun W. Milo was convicted in 2018 of felony murder with the underlying felony of attempted distribution of marijuana. During the drug buy, the victim and intended purchaser, Michael Hamilton, attacked Milo and attempted to steal the marijuana. During the melee, Milo shot and killed Hamilton. Finding no error, we affirm the judgment of the district court, though for a different legal reason from that articulated by the lower court. See *State v. Vasquez*, 287 Kan. 40, 59, 194 P.3d 563 (2008) (A lower court's ruling can be affirmed, if it is right, even for the wrong reason.).

FACTS

James Welborn and Hamilton occasionally smoked marijuana together. Hamilton texted Welborn and asked if he knew where to purchase marijuana. Welborn contacted Milo, his normal supplier, on Hamilton's behalf. Milo had "higher grade" marijuana called "Gorilla Glue" available for purchase. Hamilton agreed to purchase 4 ounces for $825 and promised Welborn he would give him one-quarter ounce for setting up the deal. Welborn agreed to accompany Milo to Hamilton's home to help facilitate the transaction.

Milo picked up Welborn in a red Pontiac Grand Am owned by his girlfriend and called Hamilton as the pair arrived at Hamilton's house. Once inside, Milo placed four 1-

ounce bags, presumably containing marijuana, on the kitchen counter. Alternatively, Milo has maintained throughout this case that he arrived at Hamilton's empty-handed because he had previously sold all of his marijuana.

Hamilton presented Milo with $325 in cash and a $500 Walmart gift card to pay for the transaction. He explained to Milo the ATM would not let him withdraw funds. Milo "didn't look too happy about" the gift card and demanded cash for the full price. Hamilton put the cash and gift card down and grabbed the marijuana. He then showed a gun in his right hand and became irate when Milo refused to accept the gift card. Pulling the bags toward him, Hamilton said "this is mine." He then grabbed Milo by the shirt and hit him with the pistol and his fists. Hamilton pinned Milo to the couch and told him he had "disrespected [his] house" and forced Milo to apologize at gunpoint. Hamilton jammed the pistol into the side of Milo's face and told Milo to "apologize to the whole fucking house," and Milo complied.

Hamilton declared again he was keeping the bags and told Milo to leave. Milo asked if he could wash the blood from his mouth, but Hamilton struck Milo in the head and told him to get out again. Hamilton began pushing Milo through the threshold, and Welborn heard a gunshot. Hamilton stumbled backwards and fell into the kitchen and Welborn saw a gun in Milo's hand. Hamilton lay on the ground with his pistol pointing back at Milo. Welborn heard two or three additional gunshots and ran from Hamilton's house.

Hamilton's wife found Hamilton's body. Afraid her daughter would see the gun, she took his pistol and hid it in the laundry basket. Officers later found a .32 caliber Mauser semi-automatic handgun with a double-feed malfunction—where the first round was not properly ejected before attempting to seat a second round—inside a tan tote. No spent .32 caliber casings were discovered. Hamilton's wife saw the shooter through the

3

still-open front door and described him as a black male in his 30s, approximately 6 feet tall, thin, wearing a white t-shirt and jeans, and carrying a black semi-automatic handgun.

Welborn ran across the street to a nearby QuikTrip and heard additional gunshots as he ran. Police arrested Welborn while he was inside after a neighbor called police and told them one of the suspects entered the gas station.

Welborn provided Milo's name during his interview and police identified Milo by cross-referencing Welborn's texts and several Facebook profiles. Milo was arrested later that day after police traced his cellphone. Milo's t-shirt, belt, belt buckle, and boxer-briefs tested positive for blood. The blood on the boxers matched Hamilton. The back of the collar of Milo's t-shirt had a mixture of blood from at least two people, with the partial major contributor matching Hamilton and the partial minor contributor matching Milo. The DNA from Milo's belt and belt buckle matched Hamilton and Milo.

Milo's pockets contained 18 one-dollar bills in an envelope covered in blood matching Hamilton's DNA. An empty Black & Milds cigarette box in Milo's possession was also covered in Hamilton's blood. Police recovered the Grand Am with noticeable blood on the driver's side door—later matched to Hamilton. Further, the Grand Am's interior visor and Milo's car keys contained blood.

On December 6, 2016, the State charged Milo and Welborn with one count of felony murder with the underlying crime of distribution of marijuana.

Prior to trial, Milo requested a self-defense instruction. At trial, the district court refused to instruct the jury on self-defense, finding that Milo was either committing or attempting to commit a forcible felony.

4

The State established Hamilton had a graze gunshot wound to the face, blunt-force injuries to the left side of his head, abrasions, minor blunt-force injuries to his body, and a fatal gunshot wound to his chest.

Milo's defense turned in part on the fact that Sarah Welborn, James Welborn's wife, had an affair with Milo shortly before Hamilton's death. This, Milo claimed, combined with the fact that Welborn admitted he knew Hamilton was racist against African-Americans, made it likely that the two had set up the visit to Hamilton's house in order to jump Milo in revenge for the affair.

Milo also pointed to inconsistencies in Hamilton's wife's story, namely that she originally told police she did not know where Hamilton's gun was, but later changed her story and admitted it was in the hamper. Finally, Milo referenced inconsistencies in Welborn's story—chiefly that he originally told police the drug transaction "never went through."

The jury convicted Milo of first-degree felony murder. The district court imposed a hard 25 sentence and "lifetime post-release supervision if released on parole." Milo directly appealed to this court under K.S.A. 22-3608.

DISCUSSION

Milo challenges his conviction on appeal in five ways. First, he claims the district court erred when it refused to instruct the jury on self-defense. Second, he argues the district court erred when it found he was not entitled to self-defense immunity. Third, Milo asserts the district court erred when it instructed the jury on attempted distribution of marijuana. Fourth, he claims the district court wrongly denied his acquittal motion. Fifth, Milo asserts cumulative error.

5

*The district court did not err by refusing to instruct the jury on self-defense and did not err by finding Milo was not entitled to self-defense immunity.*

We address Milo's first and second challenges together because they share a flawed premise. As we clarify in detail below, self-defense is never a defense to felony murder. We acknowledge our caselaw on this point has been unclear. Today we clarify the law of self-defense in the context of a felony-murder charge.

The starting point for any alleged jury instruction error is our familiar four-part *Plummer* test:

"[F]or instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v.*] *Ward* [, 292 Kan. 541, 565, 256 P.3d 801 (2011) ]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

The use of self-defense is already limited by statute as both an immunity and an affirmative defense. It is legally unavailable to a person who "[i]s attempting to commit, committing or escaping from the commission of a forcible felony." K.S.A. 2020 Supp. 21-5226(a); K.S.A. 2020 Supp. 21-5231(a). A "'[f]orcible felony' includes any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and any other felony which involves the use or threat of physical force or violence against any person." K.S.A. 2020 Supp. 21-5111(n).

6

"Forcible felonies" defined in K.S.A. 2020 Supp. 21-5111(n) are legally separate from the broader category of "inherently dangerous felonies," which serve as the underlying basis for felony-murder charges, listed in K.S.A. 2020 Supp. 21-5402(c). Although the listed forcible felonies as defined in K.S.A. 2020 Supp. 21-5111(n) are all considered inherently dangerous felonies per K.S.A. 2020 Supp. 21-5402(c), not all "inherently dangerous" felonies are considered "forcible" felonies. This partial overlap has contributed to the confusion in this area of the law.

Before we decided *State v. Barlett*, 308 Kan. 78, 418 P.3d 1253 (2018), the general rule from *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003), and *State v. Kirkpatrick*, 286 Kan. 329, 184 P.3d 247 (2008), was that a defendant merely charged with committing a forcible felony could not advance a theory of self-defense. However in *Barlett* we rejected that rule as "overly broad" and instead held:  A defendant may not advance a self-defense theory if that defendant is "already otherwise" engaged in the conduct described in K.S.A. 2020 Supp. 21-5226(a)—that is, already attempting to commit, committing, or escaping from the commission of a forcible felony—when he or she commits a separate act of violence. 308 Kan. at 84. Thus, a self-defense instruction *may* be appropriate if the same act of the defendant constituted *both* the forcible felony *and* the self-defense. This rule applies in limited factual circumstances. See *Barlett*, 308 Kan. at 80-85 (when criminal discharge of a firearm into an occupied vehicle serves as the underlying felony for a felony-murder charge and the criminal discharge also resulted in the death, self-defense may be available).

In hindsight, it is now clear that this line of cases—while correct—led to an assumption that self-defense is available to a defendant charged with felony murder so long as the defendant can plausibly claim to have not been already engaged in a forcible felony when the separate act of violence (the killing) occurred. *State v. Haygood*, 308 Kan. 1387, 1407, 430 P.3d 11 (2018) (recognizing that competing sets of facts could

7

force" depending on which version of events the jury found credible); *State v. Holley*, boils down to a credibility question . . . . [A] reasonable fact-finder could have concluded that Holley was *not* otherwise committing a forcible felony when he committed the act of violence here—shooting Smith. If Holley only drew his gun in self-defense after Smith had fired or tried to fire at Holley, Holley did not otherwise commit aggravated robbery."), *abrogated on reh'g by State v. Holley*, 315 Kan. ___, ___ P.3d ___ (2022) (No. 121,181, this day decided). This has led to cases like the one now before us in which the parties argue vigorously over whether or not an underlying felony like "allow a reasonable juror to conclude that Haygood was entitled to defend with deadly atte313 Kan. 249, 252, 254-55, 485 P.3d 614 (2021) ("[W]hether Holley used self-defense mpted distribution is in fact a "forcible felony" under K.S.A. 2020 Supp. 21-5111(n). Today we correct this error.

To do so, we must begin with the felony-murder statute. Interpretation of statutes is a question of law subject to plenary review. *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021). K.S.A. 2020 Supp. 21-5402(a)(2) provides: "Murder in the first degree is the killing of a human being committed . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." Felony murder is limited to cases where there is proof that a homicide was committed in the perpetration of, attempt to perpetrate, or flight from a felony that is inherently dangerous to human life. See *State v. Thompkins*, 263 Kan. 602, 609, 952 P.2d 1332 (1998). The felony-murder rule relieves the State of the burden of proving premeditation and malice because the killer's intent is established by proof of the collateral felony. See *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 (1976). All that is required to support a felony-murder conviction is proof that the homicide was caused by the commission of, attempt to commit, or flight from the underlying inherently dangerous felony. See *State v. Carr*, 265 Kan. 608, 614-15, 963 P.2d 421 (1998). The felony-murder rule holds those who commit or attempt to commit inherently dangerous felonies strictly liable for any killing caused by their criminal

efforts. 40 Am. Jur. 2d, Homicide § 60. See also *State v. Sophophone*, 270 Kan. 703, 706, 19 P.3d 70 (2001) ("'The purpose of the felony murder doctrine is to deter those engaged in felonies from killing negligently or accidentally.'"); *State v. Branch and Bussey*, 223 Kan. 381, 383-84, 573 P.2d 1041 (1978) ("[A]ny participant in a life-endangering felony is guilty of first degree murder when a life is taken in the course of committing or attempting to commit the felony, whether the death was intentional or accidental, or whether the participant directly caused it to occur. . . . [D]efendants are subject to the felony murder rule and it makes no difference that the killing was accidental."); *State v. Hoang*, 243 Kan. 40, 41-42, 755 P.2d 7 (1988) ("In felony-murder cases, the elements of malice, deliberation, and premeditation which are required for murder in the first degree are deemed to be supplied by felonious conduct alone if a homicide results. . . . In a felony-murder case, evidence of who the triggerman is is irrelevant and all participants are principals.").

In the recent past, our caselaw has failed to distinguish between self-defense as a legal justification absolving the defendant of criminal liability for felony murder itself versus self-defense as a legal justification absolving the defendant of criminal liability for the underlying inherently dangerous felony. See *Holley*, 313 Kan. at 254-55 (implicitly operating under the faulty premise that self-defense can be a valid defense to the crime of aggravated robbery); *State v. Beltz*, 305 Kan. 773, 780-81, 388 P.3d 93 (2017) (implicitly operating under the faulty premise that a self-defense may be a defense to the crime of attempted distribution of marijuana, if not considered a forcible felony); *State v. Mitchell*, 262 Kan. 687, 691, 942 P.2d 1 (1997) (same, but distribution of cocaine). As explained below, this distinction can be critically important for the correct resolution of certain cases.

Today we clarify the law on this point and expressly adopt the rule used by a majority of jurisdictions: Self-defense may never be used as a defense to the charge of

felony murder. See, e.g., *Gray v. State*, 463 P.2d 897, 910 (Alaska 1970) ("Where, as in this case, the defendant commits a felony which includes an immediate threat of violence, he has created a situation so fraught with peril as to preclude his claim of self-defense to any act of violence arising therefrom."); *State v. Amado*, 254 Conn. 184, 200-01, 756 A.2d 274 (2000) ("[F]elony murder is incompatible with the defense of self-defense. . . . [W]hen one kills in the commission of a felony, that person cannot claim self-defense, for 'this would be fundamentally inconsistent with the very purpose of the felony murder [statute].'"); *Sutton v. State*, 139 Md. App. 412, 454, 456-57, 776 A.2d 47 (2001) (reiterating that "self-defense is not a defense to felony murder" and dismissing defendant's argument that the jury "'could have found a very different set of facts,'" because "[t]he jury was actually given the opportunity to find a 'very different set of facts,' but, quite frankly, did not find such to be the case"); *State v. Oates*, 540 S.W.3d 858, 860-62 (Mo. 2018) ("[S]elf-defense, as a matter of law, is not a defense to felony murder."); *Schnitker v. State*, 401 P.3d 39, 42-44 (Wyo. 2017) ("We agree with the majority of jurisdictions that have addressed this issue and conclude that self-defense is not available to a defendant who kills while engaged in the perpetration of an enumerated felony.").

So long as it is legally and factually appropriate, however, self-defense may be asserted as a legal justification absolving the defendant of criminal liability for the underlying inherently dangerous felony. See *State v. Richardson*, 341 N.C. 658, 668-69, 462 S.E.2d 492 (1995) ("[H]ad the jury found that defendant acted in self-defense on the underlying felonies submitted, it could not have found defendant guilty of felony murder. . . . [T]he purpose of the felony murder rule is to deter even accidental killings from occurring during the commission of a dangerous felony. To allow self-defense, perfect or imperfect, to apply to felony murder would defeat that purpose."). In that circumstance, the felony-murder charge would necessarily fail as a matter of law given the State's failure to prove one of the elements of felony murder—namely, the underlying felony.

This rule is in accord with our statements on the nature of the felony-murder rule prior to the recent trend looking only to the forcible felony statute to determine whether a self-defense instruction ought to be given. See *Mitchell*, 262 Kan. at 695 (implicitly recognizing that in Kansas, the governing rule is that "self-defense is not available in felony-murder cases"); *State v. Chism*, 243 Kan. 484, 491, 759 P.2d 105 (1988) ("Self-defense or accident are not defenses to felony murder. It is the purpose of the felony-murder rule to prevent deaths from these causes."); *State v. Underwood*, 228 Kan. 294, 305-06, 615 P.2d 153 (1980) ("[F]iling a charge under the felony murder rule in most, if not all, cases removes any possibility of establishing the defense of self-defense. . . . [T]he defendant when charged with felony murder is not entitled to an instruction on self-defense.").

It follows, then, that while a self-defense instruction is never legally appropriate with respect to a charge of felony murder, such an instruction may be given in felony-murder cases if self-defense is appropriately used to negate criminal liability for the underlying inherently dangerous felony. Self-defense—an affirmative defense—justifies actions that would otherwise constitute the charged crime. *Haygood*, 308 Kan. at 1406. "A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies." K.S.A. 2020 Supp. 21-5108(c).

As already mentioned, recent past decisions of this court have not followed this rule. That is, we have allowed (or at least considered) self-defense instructions in certain felony-murder cases when such an instruction was clearly not legally appropriate. This misstep arose out of a misplaced focus on whether the underlying inherently dangerous felony constituted a "forcible felony." This often occurred in "drug deal gone bad" cases. See, e.g., *State v. Jacques*, 270 Kan. 173, 180-81, 14 P.3d 409 (2000) (cocaine possession

was a forcible felony when the defendant stabbed the victim after being attacked, noting the "aura of violence surrounding the possession of illegal drugs"); *State v. Ackward*, 281 Kan. 2, 24-26, 128 P.3d 382 (2006) (deeming possession of marijuana with intent to sell a forcible felony when two of the four people involved with a drug transaction were armed, and stating that "[t]he possession of or desire to possess illegal drugs often brews an atmosphere of violence with participants being susceptible to robbery and physical harm by others wanting their drugs or money").

These decisions were analytically flawed, however, because they skipped a necessary step along the analytical path. We have clarified that self-defense in a felony-murder case can *only* negate criminal liability for the underlying inherently dangerous felony as an *element* of felony murder (self-defense can never be a legal justification for the killing itself). Given this, a court presented with a self-defense claim in the context of felony murder must first examine the elements of the underlying inherently dangerous felony alleged by the State to determine whether any of those elements can be negated by a claim of self-defense. If the answer is no, then the self-defense instruction will not be legally appropriate.

The key question to ask is whether there is an element of force, inherently necessary to the commission of the underlying crime, which could be justified by the defense of oneself or another. Stated another way, some crimes contain an element—the use of force—which may be negated by a proper claim of self-defense. One example is the inherently dangerous felony of criminal discharge of a firearm. K.S.A. 2020 Supp. 21-5402(c)(1)(O); K.S.A. 2020 Supp. 21-6308(a). The elements of that crime include that the defendant discharged a firearm, and that it was directed either at a dwelling or a vehicle in which there was a human being present. K.S.A. 2020 Supp. 21-6308(a). If the act of shooting that constitutes the criminal discharge was done in an act of self-defense, then self-defense should be available to the defendant. See *State v. Alderson*, 260 Kan.

12

445, 922 P.2d 435 (1996) (defendant charged with felony murder based on the underlying felony of criminal discharge of a firearm at an occupied vehicle, but self-defense instruction given because defendant argued he fired in self-defense).

On the other hand, many crimes do not require the use of force at all to satisfy all elements. With regard to these crimes, self-defense is legally inappropriate. When there is no use of force to be legally justified, self-defense is simply a non sequitur. Other crimes do have an element of force, but that use of force cannot legally be justified as a defense of oneself or another. For example, aggravated robbery includes as an element the taking of property "by force or by threat of bodily harm." K.S.A. 2020 Supp. 21-5420. But that force still cannot be justified on the basis of defending oneself or another. See *State v. Holley*, 315 Kan. at ___, slip op. at 11; see also *Thomas v. Arn*, 704 F.2d 865, 878 (6th Cir. 1983) (recognizing that "self-defense does not negate any elements" of the crimes of felonious assault or aggravated assault); *State v. Asante*, 236 A.3d 464, 470 (Me. 2020) (quoting *State v. Bradley*, 521 A.2d 289, 291 [Me. 1987]) ("'[S]elf-defense is not available to a person committing or about to commit a robbery.'").

Accordingly, the next step in Milo's case is to examine the elements of the underlying inherently dangerous felony—distribution of a controlled substance—to determine whether any of the elements in K.S.A. 2020 Supp. 21-5705 can be negated by a claim of self-defense. If no force would be necessary to commit all elements of that criminal act, Milo cannot claim a legal justification under our self-defense statutes. He would thus not be entitled to either self-defense immunity or a self-defense instruction.

K.S.A. 2020 Supp. 21-5705(a)(4) provides that "[i]t shall be unlawful for any person to distribute or possess with the intent to distribute . . . any hallucinogenic drug designated in subsection (d) of K.S.A. 65-4105," which includes marijuana. K.S.A. 65-4105(d)(17). Distribute is defined as "the actual or constructive transfer from one person

13

to another of some item" and includes "sale, offer for sale, furnishing, buying for, delivering, giving, or any act that causes or is intended to cause some item to be transferred from one person to another." K.S.A. 2020 Supp. 21-5111(g). Thus, the crime of distribution of marijuana, while statutorily categorized as inherently dangerous, does not include any element requiring the use of force, and so no element of the crime can be negated by a claim of self-defense. See *State v. Oates*, 540 S.W.3d 858, 860 (Mo. 2018) (in a prosecution for felony murder based on the underlying felony of attempting to distribute a controlled substance, self-defense cannot be used as a matter of law); *State v. Wade*, 200 W. Va. 637, 645, 490 S.E.2d 724 (1997) (examining "traditional applications of self defense" and asserting that "we can conceive of no circumstances where the offense of 'delivery of a controlled substance,' standing alone, would yield to a claim of self-defense").

Simply put, there is no legal self-defense justification for the sale of cocaine or marijuana. Thus, as a matter of law, Milo is not entitled to a self-defense instruction or to self-defense immunity.

*The instructions on attempted distribution of marijuana were not in error.*

Milo next argues the district court committed two separate instructional errors in the context of the underlying felony of attempted distribution of marijuana. First, Milo claims error in the elements instruction. Second, Milo argues the district court erred by refusing to give a requested instruction.

Again, we rely on our *Plummer* framework, addressing legal appropriateness first, and moving to factual appropriateness only if necessary. *State v. Broxton*, 311 Kan. 357, 361, 461 P.3d 54 (2020). "A legally appropriate jury instruction '"fairly and accurately state[s] the applicable law, and an instruction that does not do so [is] legally infirm."'" 311 Kan. at 361 (quoting *State v. Murrin*, 309 Kan. 385, 392, 435 P.3d 1126 [2019]).

14

The district court instructed the jury as follows, and we highlight the portion Milo now claims is error:

"The defendant is charged with the crime of First Degree Felony Murder. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.  The defendant killed Michael Hamilton;

"2.  The killing was done while defendant was committing or attempting to commit the crime of distribution of marijuana; and

"3.  This act occurred on or about the 2nd day of December, 2016, in Sedgwick County, Kansas.

"*The elements of attempt to commit distribution of a controlled substance are as follows:*

"*1.  The defendant performed an overt act towards the commission of distribution of a controlled substance;*

"*2.  The defendant did so with the intent to commit distribution of a controlled substance;*

"*3.  The defendant failed to complete commission of distribution of a controlled substance; and*

15

"*4. The act occurred on or about the 2nd day of December, 2016, in Sedgwick County, Kansas.*

"An overt act necessarily must extend beyond mere preparation made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an over[t] act.

"The elements of the completed crime of distribution of a controlled substance are as follows:

"1.  The defendant distributed marijuana;

"2.  The quantity of the marijuana distributed was one-fourth pound; and

"3.  This act occurred on or about the 2nd day of December, 2016, in Sedgwick County, Kansas.

"The State must prove that the defendant intended to commit the crime of distribution of marijuana. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State.

"'Distribute' means the actual, constructive, or attempted transfer of an item from one person to another, whether or not there is an agency relationship between them. 'Distribute' includes sale, offer for sale, or any act that causes an item to be transferred from one person to another.

"'Possession' means having joint or exclusive control over an item with knowledge of and the intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." (Emphasis added.)

16

The instruction was legally appropriate because it accurately and precisely aligned with the statutory elements and definitions and followed the appropriate PIK instructions. See K.S.A. 2020 Supp. 21-5301(a)-(b) (defining "attempt"); K.S.A. 2020 Supp. 21-5111(g) (defining "distribute"); PIK Crim. 4th 52.010, 53.010, 54.120, 57.020. Milo has offered no argument that the given instruction failed to accurately state the law.

The given instruction was also factually appropriate. To be factually appropriate, there must be sufficient evidence, viewed in the light most favorable to the requesting party, to support the instruction. *State v. Roberts*, 314 Kan. 835, Syl. ¶ 1, 503 P.3d 227 (2022). The question therefore becomes whether the instruction was supported by sufficient evidence when viewed in the light most favorable to the State. "'Such an inquiry is closely akin to the sufficiency of the evidence review frequently performed by appellate courts in criminal cases.'" *State v. Dominguez*, 299 Kan. 567, 574, 328 P.3d 1094 (2014). Sufficiency of the evidence arguments consider whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. See *State v. Coble*, 312 Kan. 615, 626-27, 479 P.3d 201 (2021).

There was sufficient evidence for a rational fact-finder to find that Milo attempted to distribute marijuana. However, Milo offers arguments that any "attempt" ended as soon as he placed the bags on the kitchen counter—completing the offense. Through this argument, he claims any "attempted" distribution was not possible because the crime had already been completed. However, this version of Milo's summation of the facts neglects several key details.

K.S.A. 2020 Supp. 21-5301(a)-(b) defines attempt:

> "(a) An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime.

17

"(b) It shall not be a defense to a charge of attempt that the circumstances under which the act was performed or the means employed or the act itself were such that the commission of the crime was not possible."

Crucially, Welborn testified several times that during the exchange, the marijuana baggies, cash, and Walmart gift card remained on the kitchen counter as he fled Hamilton's home. As a result, Milo never received the payment for the marijuana and the deal was interrupted midway. This was further corroborated by the fact that $325 and the Walmart card were recovered from Hamilton's wallet, which was provided to police by Hamilton's wife, who recovered it from "the kitchen on the bar table."

With this testimony, Welborn sufficiently established Milo attempted—but did not fulfill—the elements of distribution of a controlled substance. Milo brought the marijuana to Hamilton's home with the expectation he would receive $825 in cash. This easily falls under K.S.A. 2020 Supp. 21-5111(g)'s definition of distribute. Milo performed an "act that causes or is intended to cause some item to be transferred from one person to another." See K.S.A. 2020 Supp. 21-5111(g). However, this transfer was never completed and therefore constitutes an attempt. Milo performed an "overt act towards" distribution of marijuana by bringing the drugs to Hamilton, but the sale did not successfully conclude because Hamilton did not bring the agreed upon $825 cash. See K.S.A. 2020 Supp. 21-5301(a).

Neither party ended up with the desired end result—Milo did not receive the cash and the marijuana remained on Hamilton's kitchen counter. While Milo no longer possessed the marijuana, it was not because he successfully sold it to Hamilton, but because Hamilton grabbed the marijuana, Hamilton attacked Milo, Milo shot Hamilton, and Milo fled the house. Under these facts, an attempt instruction is factually appropriate.

18

We now turn to Milo's claim that the lower court erred when it refused to give an added instruction he had requested. Counsel orally requested the instruction on several occasions, but the record does not include a written version of the request. We can discern, however, that Milo asked the district court to instruct the jury that if it concluded Milo did not possess any marijuana, then he could not be guilty of attempted distribution.

Milo's central claim is that "one cannot take an overt act to transfer something unless they have possession of such an item." This is an incorrect statement of the law. It is true that we have recently clarified that possession is a prerequisite to distribution. *State v. Crosby*, 312 Kan. 630, 638, 479 P.3d 167 (2021) ("As a definitional matter, a person cannot transfer something one does not control. Therefore, in order to convict a defendant of distribution of a controlled substance . . . the State must present sufficient evidence of possession as a necessary part of the crime."). But the overt act element of an attempt *does not* require possession as a prerequisite. An individual can take steps toward completing (that is, can attempt) a distribution prior to actually obtaining possession of the controlled substance to be distributed. See *State v. George*, 311 Kan. 693, 693-94, 466 P.3d 469 (2020) (finding that driving to a home with the intent to get an Xbox to trade for drugs was an overt act establishing an attempt to distribute); *State v. Westmoreland*, No. 117,833, 2018 WL 3198410, at *4-6 (Kan. App. 2018) (unpublished opinion) (finding an agreement to sell and purchase marijuana and the careful packaging and transportation of that marijuana in a car was sufficient to provide an overt act in pursuit of attempted distribution of marijuana); *State v. Garcia*, No. 113,969, 2016 WL 3408022, at *7 (Kan. App. 2016) (unpublished opinion) (finding "the use of a phone to arrange a time and place to sell drugs" constituted an overt act to support a conspiracy to distribute controlled substances conviction). The requested instruction was not legally appropriate, and the lower court did not err.

19

*The district court did not err when it denied Milo's motion for acquittal.*

Milo also claims the district court erred when it denied his acquittal motion. Milo argues the State presented insufficient evidence that Milo distributed, or attempted to distribute, marijuana. More specifically, Milo argues that the State failed to prove the presence of any marijuana and failed to provide scientific testing of any substance found at Hamilton's proving it was marijuana.

Milo classifies the marijuana evidence as "shocking[ly] little," and points to Crime Scene Investigator Chris Engle-Tjaden's testimony regarding brown bags of a green substance seized from Hamilton's home. Milo further discounts the "Gorilla Glue" text messages because Detective Chad Beard arrived at the conclusion this phrase meant marijuana after Googling it. Essentially, Milo argues the State never proved "Gorilla Glue" is marijuana.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Only in rare cases where testimony is so incredible no reasonable fact-finder could find guilt beyond a reasonable doubt should a guilty verdict be reversed. *State v. Torres*, 308 Kan. 476, 488, 421 P.3d 733 (2018).

Milo's argument is little more than an invitation for this court to reweigh circumstantial evidence—an invitation this court should not take. See *Chandler*, 307 Kan. at 668. The testimonial accounts of Welborn, law enforcement officials, and

corroborating text messages clearly provide a sufficient basis whereby "'a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" See 307 Kan. at 668. While we appreciate that scientific testing certainly would have provided additional weight to the State's case, the presented testimony provides a sufficient basis for a reasonable juror to conclude the substance furnished by Milo was marijuana.

The State presented sufficient evidence Milo attempted to distribute marijuana through Welborn's detailed testimony corroborated by several witnesses and the physical evidence. Accordingly, the district court did not err when it denied Milo's acquittal motion on those grounds.

*Cumulative error did not deny Milo a fair trial.*

Lastly, Milo argues cumulative error denied him a fair trial. Finding no trial errors, the cumulative error doctrine does not apply. *State v. Green*, 311 Kan. 960, Syl. ¶ 7, 469 P.3d 1228 (2020) ("The cumulative error doctrine does not apply when no errors or only one error is identified by an appellate court.").

Affirmed.